INTERNATIONAL PRODUCE, INC.,
Petitioner and
Cross-Respondent-Appellee,

v.

A/S ROSSHAVET, Owners of the S.S.
Ross Isle, Respondent and
Cross-Petitioner-Appellant.

No. 132, Docket 80–7387.

United States Court of Appeals,
Second Circuit.

Argued Oct. 15, 1980.

Decided Jan. 8, 1981.

John C. Moore, New York City (Haight, Gardner, Poor & Havens, Mark C. Flavin, New York City, of counsel), for respondent and cross-petitioner-appellant, A/S Rosshavet.

Patrick V. Martin, New York City (Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy, J. Edwin Carey, Anthony J. Mavronicolas, New York City, of counsel), for petitioner and cross-respondent-appellee, International Produce.

Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

A/S Rosshavet appeals from an order of the Southern District of New York vacating an arbitration award. A unanimous three-member arbitration panel awarded Rosshavet $1.2 million as damages arising from a ship's charter agreement. The opposing party, International Produce, Inc., petitioned the district court under 9 U.S.C. § 10 (1976) for an order vacating that award on the ground that one of the arbitrators, Hammond L. Cederholm, should have recused himself because of his role in an unrelated arbitration. Rosshavet cross-petitioned for an order confirming the award. The district court granted International's petition to vacate the award, finding that the arbitrator's appearance of bias toward one of the law firms in the arbitration violated 9 U.S.C. § 10(b).[1] We reverse that

---

1. The district court at first entered judgment on April 30, 1980, which denied the petition to vacate and granted the petition to confirm. The district court corrected that judgment by an order of May 7 to reflect the memorandum opinion accurately.

order and remand with direction to confirm the award.

At the time of the incident leading to the challenged arbitration, Rosshavet owned a vessel named the S.S. Ross Isle. International chartered it through a charter party dated March 7, 1974. At International's direction, the Ross Isle was loaded with corn and soybeans at Destrehan, Louisiana on March 22, 1974 and proceeded downriver on the evening of March 24. Seven and one-half hours later, on March 25, the vessel ran aground in the Southwest Pass of the Mississippi River. Invoking the arbitration clause of the charter party, each party asserted claims against the other arising from the grounding and the related delay.

As provided in the arbitration clause, Rosshavet and International each appointed an arbitrator, and the two arbitrators then appointed a third. Rosshavet appointed Lloyd C. Nelson; International appointed Mack G. Klosty; and Nelson and Klosty then selected Hammond L. Cederholm, to act as a third arbitrator and chairman. Cederholm is, and was at the time of his selection, a Vice-President of James W. Elwell & Co., Inc. (Elwell), a management firm retained by owners of various commercial vessels.

At the initial September 8, 1977 hearing, each of the arbitrators disclosed possible conflicts of interest. Nelson, Rosshavet's appointee, stated that his firm had a long-standing business relationship with International's parent corporation. Klosty, International's appointee, disclosed that he had previously been appointed as an arbitrator by International and that he had done business with them as a broker. International's counsel, Hill, Rivkins, Carey, Loesberg, O'Brien & Mulroy (Hill Rivkins), accepted Nelson's and Klosty's participation. Cederholm stated that, although he had no dealing with Rosshavet or International, Haight, Gardner, Poor & Havens (Haight Gardner)—who was representing Rosshavet—was also handling a Protection and Indemnity Club matter (the Mary S. Arbitration # 1) for one of Elwell's clients. Cederholm then invited questions from both

counsel. International's counsel, J. Edwin Carey, of Hill Rivkins, stated that he had no questions and that the panel was acceptable to International. He did not ask Cederholm the name of the vessel involved in Haight Gardner's representation; if he had, he would have learned that it was the Mary S.

One of Elwell's clients, World Carrier Corporation owned the Mary S. Neither Cederholm nor Elwell had any financial interest in World Carrier, and Elwell received a fixed fee regardless of the Mary S.'s profitability. The Mary S. was protected by a Freight, Defense and Demurrage policy of the Protection and Indemnity Club Assuranceforeningen Gard (Gard), a common type of maritime insurance that covers the legal expenses of any claims involving the vessel but not any ultimate liability on such claims. The law firm of Haight Gardner had represented the Gard in New York since 1936; and when the first arbitration hearing in the Ross Isle dispute was held, Haight Gardner was already representing World Carrier as owner of the Mary S. in an unrelated dispute, the Mary S. Arbitration # 1. The dispute which led to the Mary S. Arbitration # 2 had not yet arisen.

On December 6, 1977, Rosshavet presented its witnesses in the arbitration, which was held in New York: Captain Hjarand Sem, the Master of the Ross Isle, and Captain Walter Durabb, the Branch Pilot in control of the Ross Isle when it went aground. Sem had come from Norway for the hearing and Durabb from Louisiana. The previous afternoon, however, Arbitrator Nelson had become ill and was unable to attend the hearings. Because of the expense of bringing the witnesses to New York and the uncertainty of their future availability, the parties agreed to proceed with only two arbitrators on the understanding that the missing arbitrator would read the transcript.

Two days later, on December 8, 1977, the Mary S. became involved in a dispute related to the closing of the St. Lawrence Seaway. Cederholm, as an officer of the firm that managed the Mary S., was involved in the negotiations which preceded the im-

passe. The owners of the Mary S. again retained Haight Gardner as recommended by the Gard's New York representatives; the charterers retained Hill Rivkins. Thus, the choice of law firms in the Mary S. Arbitration # 2 left Cederholm in the position of being a non-party witness in a suit between parties who were represented by the same law firms that were appearing before him in the Ross Isle arbitration.

On January 5, 1978, Carey of Hill Rivkins telephoned Cederholm and suggested that he should resign from the Ross Isle panel because a Haight Gardner attorney would "in all likelihood" call Cederholm and prepare him to testify in the Mary S. arbitration and a Hill Rivkins attorney would then cross-examine him. However, only one attorney—Howard Miller, an associate at Haight Gardner—was involved in both the Mary S. and the Ross Isle disputes. That same day, Cederholm wrote to his fellow arbitrators and to both counsel in the Ross Isle arbitration, informing them of the alleged conflict of interest and seeking their recommendations.

Rosshavet's counsel urged that Cederholm stay on the panel to avoid prejudicing their client: if Cederholm withdrew, there would be only one arbitrator who had observed Rosshavet's witnesses. Both of the other arbitrators strongly discouraged Cederholm's resignation, stressing Cederholm's personal integrity as well as the difficulty of finding any arbitrator in the relatively small maritime community without some possible speculative conflict. Carey, however, formally requested Cederholm's withdrawal, although he simultaneously expressed confidence that Cederholm could "continue to act judiciously and objectively without partiality or bias."

On January 13, 1978, Cederholm informed Carey that he was remaining on the panel because no aspect of the Mary S. Arbitration # 2 threatened his impartiality in the Ross Isle arbitration: "they are entirely dissimilar cases and there are no inter-relationships between the principals of both cases." Cederholm did condition his decision on the removal of the one attorney working on both cases, Howard Miller of Haight Gardner, from one case or the other. Haight Gardner immediately removed Miller from the Mary S. case. Carey acknowledged Cederholm's decision and announced his intention to proceed with the introduction of evidence at the January 17 hearing. Cederholm wrote to Carey on January 26 and proposed that, since Carey had not conceded or acknowledged the propriety of his remaining on the panel, Hill Rivkins should consider withdrawing from the Mary S. arbitration if it perceived a conflict. Carey did not reply.

Thereafter, on May 16, 1978, Cederholm gave 80 pages of testimony in the Mary S. Arbitration # 2, including cross-examination by a Hill Rivkins attorney. One final hearing was held in the Ross Isle arbitration on June 6, 1978. Over a year later, on July 1, 1979, the Ross Isle panel unanimously held that the vessel's grounding was caused by International's breach of its warranty of safe port and awarded Rosshavet $1,194,535.57, including interest to the date of the award, with further annual interest of 9% if payment was not complete by July 31, 1979. On July 27, 1979, International petitioned the district court for an order vacating the award; on August 21, Rosshavet cross-petitioned seeking confirmation.

Judge Broderick, in a memorandum opinion of April 16, 1980, vacated the award under 9 U.S.C. § 10(b), on the ground that the totality of Cederholm's relationship to the Haight Gardner and Hill Rivkins law firms "created the appearance of bias." We disagree.

The United States Arbitration Act of 1925, 9 U.S.C. § 10 (1976), authorizes a district court to vacate an arbitration award under specified circumstances, including "[w]here there was evident partiality or corruption in the arbitrators, or either of them."[2] In believing that the standard

---

2. 9 U.S.C. § 10 (1976) provides:
    In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

for reviewing the award was whether there was an "appearance of bias," the district court was equating that standard with "evident partiality." We do not find support in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), for the district court's equating of "appearance of bias" with "evident partiality" in view of the facts of that case.

In *Commonwealth Coatings*, the challenged arbitrator had earned about $12,000 in fees over a period of four or five years for consulting services rendered to the prevailing party which included services on the very project there involved. The arbitrator did not disclose this relationship and it was not known to the losing party. Mr. Justice Black's plurality opinion found that the arbitrator's failure to disclose required setting aside the award for "evident partiality." He wrote that an arbitration panel "not only must be unbiased but also must avoid even the appearance of bias." 393 U.S. at 150, 89 S.Ct. at 340.

However, Mr. Justice White, writing for himself and Mr. Justice Marshall, concurred for somewhat different reasons:

> The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges.... [I]t is enough for present purposes to hold, as the Court does, that where the arbitrator has a *substantial interest* in a firm which has done more than trivial business with *a party* [to the arbitration], that fact must be *disclosed.*

393 U.S. at 151–152, 89 S.Ct. at 340 (emphasis added). Thus two of the justices restricted the scope of the Court's ruling to situations where business and financial dealings with a party are not disclosed by the arbitrator and disassociated themselves from Justice Black's dictum about "appearance of bias." Three justices dissented.

■■■ We agree, therefore, with the appellant, that the Supreme Court in *Commonwealth Coatings* did not expand the § 10 standard of "evident partiality" to include "appearance of bias." In *Commonwealth Coatings* there was clear, unexplained evidence of "evident partiality." Here we have an assertion of "appearance of bias" which seems to us, at best, to be speculation without substance.[3] Cederholm fully revealed his relationship to Haight Gardner, and Carey did not inquire further. *See Andros Compania Maritima S.A. v. Marc. Rich & Co., A.G.*, 579 F.2d 691 (2d Cir. 1978). The Mary S. Arbitration # 2, which only developed into an arbitrable dispute later, did not involve either of the parties in the Ross Isle arbitration. By happenstance, it did involve the same law firms, but Cederholm's role was only that of a witness who testified and was cross-examined by the Hill Rivkins lawyer. There was no claim of bias on the part of Cederholm, or even of any animosity toward any counsel. Thus, the record is completely bare of anything remotely resembling "evident partiality." *See Ilios Shipping and Trading Corp. v. American Anthracite and Bituminous Coal Corp.*, 148 F.Supp. 698 (S.D.N.Y.), *aff'd*, 245 F.2d 873 (2d Cir. 1957) (per curiam). We doubt that there is any substantial basis for finding even an "appearance of bias" in Cederholm's position or anything he did. Be that as it may, we are convinced that there is no evidence of "evident partiality."

It is not unusual that those who are selected as arbitrators in maritime arbitrations have had numerous prior dealings with one or more of the parties or their

---

(a) Where the award was procured by corruption, fraud, or undue means.
(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

**3.** It does not follow that an arbitrator's personal feelings in favor of or against one attorney would necessarily be transferred to another attorney in the same firm. Our situation is thus radically different from that of an arbitrator who has close personal dealings with the very same attorney who is arguing before that arbitrator. *See, e. g., Sanko S.S. Co. v. Cook Industries, Inc.*, 495 F.2d 1260 (2d Cir. 1973). Of course, here there is no suggestion that Mr. Cederholm was in fact biased either for or against any particular attorney.

counsel. Cederholm's extensive involvement in the maritime community was not unique; both of the other arbitrators revealed past dealings with one of the parties. Arbitrator Klosty aptly analogized New York's maritime-arbitration community to a busy harbor, where the wakes of the members often cross.

The most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose. Since they are chosen precisely because of their involvement in that community, some degree of overlapping representation and interest inevitably results. *See, e. g., Garfield & Co. v. Wiest,* 432 F.2d 849 (2d Cir. 1970), *cert. denied,* 401 U.S. 940, 91 S.Ct. 939, 28 L.Ed.2d 220 (1971). Those chosen as arbitrators in important shipping arbitrations have typically participated in a great number of prior maritime disputes, not only as arbitrators but also as parties and witnesses. They have therefore almost inevitably come into contact with a significant proportion of the relatively few lawyers who make up the New York admiralty bar. Under these circumstances, a decision on our part to vacate arbitration awards whenever a mere appearance of bias can be made out would seriously disrupt the salutary process of settling maritime disputes through arbitration. We are convinced that the goals of the arbitration system would not be served if arbitrators and Article III judges were held to the same high standard. To vacate an arbitration award where nothing more than an appearance of bias is alleged would be "automatically to disqualify the best informed and most capable potential arbitrators." *Commonwealth Coatings, supra,* 393 U.S. at 150, 89 S.Ct. at 340 (White, J., concurring). This we decline to do.

Finally, we see no merit in International's assertion that Cederholm's conduct violated section 9 of the Rules of the Society of Maritime Arbitrators, which requires an arbitrator to disclose, no later than the first hearing, any relationship with counsel for either party. Cederholm fully revealed his connection with Haight Gardner at the first hearing on September 8, 1977. Developments thereafter in the Mary S. Arbitration # 2 were considered by the other arbitrators at Cederholm's request. We think it significant that, after all the relevant facts regarding any possible bias on Cederholm's part were disclosed to counsel and the arbitrators, the other two arbitrators—including, of course, the one selected by International—saw no impediment to Cederholm's continuing as arbitrator and urged him to remain.

We therefore reverse the district court's order which vacated the award on grounds of "appearance of bias," and remand with directions to confirm the award.