### SANFORD HOME FOR ADULTS, Plaintiff,

v.

### LOCAL 6, IFHP, Defendant.

### No. 86 CIV. 7700 (PKL).

United States District Court, S.D. New York.

July 30, 1987.

Jeffrey M. Strashun, Union, N.J., for plaintiff; Jeffrey M. Strashun, of counsel.

Laufer & Farkash, New York City, for defendant; Jacob Laufer, Patricia M. Karish, of counsel.

## OPINION & ORDER

LEISURE, District Judge:

Plaintiff Sanford Home for Adults ("Sanford"), is an employer, some of whose employees are members of the International Federation of Health Professionals ("IFHP"). Defendant, Local 6, is a division of the IFHP. Plaintiff has brought a motion pursuant to 9 U.S.C. § 9 seeking an order confirming the award of Arbitrator Abraham Mordowitz rendered on August 28, 1986, and for counsel fees and costs incurred in seeking confirmation of this award.[i] Defendant has cross-moved for

1. Section 9 of Title 9 U.S.C. provides as follows:

If the parties in their agreement have agreed

vacatur of the award on the ground that Mordowitz was "evidently partial," as an arbitrator.

## FACTUAL BACKGROUND

On August 31, 1978, the parties signed a collective bargaining agreement (the "Agreement"), Affirmation of Jeffrey M. Strashun, Esq., affirmed on October 6, 1986 ("Strashun Aff."), Exhibit A, attached thereto, in which Sanford agreed, *inter alia*, to discharge employees who were no longer members, in good standing, of the IFHP. As part of the Agreement, Local 6 agreed to "indemnify and hold the Emploeyr [sic] harmless against any and all actions, claims, suits, damages or expenses incurred by reason of discharge effected at the request of the Union." Agreement at § 2(C). The Agreement also provided that complaints, disputes, controversies or grievances unsettled between the parties would be submitted to an arbitrator for resolution. *Id.* at § 8(A). The Agreement specified that Israel Fogel would act as arbitrator. *Id.* at § 8(B). In the event Fogel was unable to arbitrate, Abraham Mordowitz would take his place. *Id.* In the event Mordowitz was unable to arbitrate, Alan Weisenfeld would take his place. *Id.* The Agreement also provided that if "all of the foregoing are unavailable ... then [Sanford] and [Local 6] shall ...

designate another person to act as such [arbitrator]." *Id.*

On October 5, 1978, Local 6 requested that Sanford discharge certain employees because of their failure to become members of the Union. Affirmation of Jeffrey M. Strashun, Esq., affirmed November 12, 1986 ("Strashun Aff. II"), Ex. A attached thereto. Sanford complied, discharging two employees, Blanca Llanos and Elena Montaneau. Subsequently, Llanos and Montaneau filed charges at the NLRB, claiming that the discharges were discriminatory, in violation of Section 8(a)(3) of the National Labor Relations Act. Sanford's counsel for the NLRB proceedings was Morris Tuchman, Esq., who had represented Sanford in other labor matters with Local 6. It was Tuchman who had recommended the arbitrators listed in the Agreement. Ultimately, the NLRB ordered Sanford to reinstate Llanos and Montaneau as employees and to reimburse them for their lost earnings.[2]

Pursuant to the indemnification provision of the Agreement, Sanford sought reimbursement for the sum it had paid to Llanos and Montaneau. Local 6, however, refused to indemnify Sanford. Sanford, therefore, sought enforcement of the indemnification provisions of the Agreement by way of arbitration.[3] At this time, Jeffrey Strashun, Esq., was selected to repre-

that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title [9 U.S.C. §§ 10, 11]. If no court is specified in the agreement of the parties, then such application may be made to the United States court in and for the district within which such award was made. Notice of the application shall be served upon the adverse party, and thereupon the court shall have jurisdiction of such party as though he had appeared generally in the proceeding. If the adverse party is a resident of the district within which the award was made, such service shall be made upon the adverse party or his attorney as prescribed by law for service of notice of motion in an action in the same court. If the adverse party shall be a nonresi-

dent, then the notice of the application shall be served by the marshal of any district within which the adverse party may be found in like manner as other process of the court.

**2.** The Court notes that during the pendency of the aforementioned litigation, Sanford was sold to new owners who signed labor agreements with another union.

**3.** The arbitration clause contained in the Agreement provides as follows:

All complaints, disputes, controversies or grievances arising between the parties hereto involving questions of interpretation or application of any clause of this Agreement, or any acts, conduct or relations between any of the parties hereto and/or between the Union and any Employer, directly or indirectly, which shall not have been adjusted by and between those involved shall be submitted to the [arbitrator] ... and his decision shall be final and binding upon the parties hereto.
Strashun Aff. Ex. A at § 8(A).

sent Sanford for the arbitration hearing. Tuchman claimed he was reluctant to engage in an adversarial proceeding with Local 6, due to their past relationship, and had therefore provided Sanford with a list of alternative counsel, which included Strashun. Strashun drafted the initial request for arbitration and has remained sole counsel to plaintiff for this matter since that time.

Prior to the arbitration award, Sanford moved that Israel Fogel, the first arbitrator named in the Agreement, recuse himself, on the ground that Fogel's attorney-client relationship with Local 6's attorney impaired Fogel's ability to arbitrate impartially. On April 15, 1986, Fogel granted Sanford's motion, Affirmation of Jacob Laufer, Esq., affirmed October 28, 1986 ("Laufer Aff."), Ex. D attached thereto, for recusal, thereby activating Mordowitz as arbitrator.

On May 6, 1986, after discovering that there had been a previous business relationship between Fogel and Sanford, counsel for Local 6 informed Mordowitz that all three arbitrators were unacceptable to Local 6. Strashun Aff. II, Ex. F. William Perry, president of Local 6, had obtained third-party information outlining a previous relationship between Mordowitz and Tuchman, in which Mordowitz had served as Tuchman's attorney in an action concerning Tuchman and his former partners.[4] Affidavit of Abraham Mordowitz, Esq., sworn to on Dec. 16, 1986 ("Mordowitz Aff."), ¶ 6. Mordowitz responded to Local 6's request by stating that without documentation he could not reach a decision as to how to proceed. Laufer Aff., Ex. I. Counsel for Local 6 did not offer documentation; instead, he suggested that the parties use the American Arbitration Association in place of the designated arbitrators.

On August 28, 1986, pursuant to notice, Mordowitz conducted an arbitration hearing. Sanford was present. Local 6, however, was absent. Subsequently, Mordowitz awarded Sanford money compensation pursuant to Sanford's request. The award included reimbursement for: (1) $8,500 pre-

viously paid by Sanford for lost earnings suffered by the two employees; (2) $2,475 in legal fees and expenses incurred by Sanford; (3) and $500 for arbitration expenses incurred by Sanford. The award also included prospective fees for any Court confirmation that would be necessary. Subsequently, Sanford requested that Local 6 comply with said award. Strashun Aff., Ex. C. Local 6 failed to do so. Sanford, therefore, brought the instant motion seeking confirmation. Defendant then filed its cross-motion.

Only after the filing of these motions, did defendant outline the alleged relationship between Tuchman and Mordowitz, which provided it with grounds to doubt the impartiality of the arbitrator. First, defendant expresses concern that Strashun is listed on Tuchman's firm's letter head as "New Jersey Counsel." Strashun Aff. II, Ex. B. The Court notes, however, that Strashun's correspondence concerning the instant action all appears on his own firm's letter head and backings. *See, e.g.,* Strashun Aff. II, Exs. D and E. Defendant also points out that Strashun's wife, Brenda Pilchick Strashun, Esq., is an associate with the "law firm of Morris Tuchman" and has concededly assisted her husband's preparation for the instant litigation by performing certain legal research activities.

## DISCUSSION

The Court notes at the outset that much of the conflict in the present case could have been avoided by the earlier disclosure of ties between the designated arbitrators and the attorneys representing the parties. Both parties in the instant dispute had business ties with at least one of the arbitrators designated under the Agreement. Had these relationships been revealed, the parties could have arranged for an alternate arbitrator, as provided for under the Agreement. This Court must now, however, decide whether the relationship among Mordowitz, plaintiff and plaintiff's counsel rises to a level of bias sufficient to merit vacatur.

---

**4.** Said action, commenced in 1985, and since settled, was unrelated to the instant dispute.

## A. *Standard of Review*

When parties have selected arbitrators as their preferred method for dispute resolution, "the role of the courts is limited to ascertaining whether there exists one of the specific grounds for the vacation of an award, provided in § 10 of the Arbitration Act...." *Saxis Steamship Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 581 (2d Cir.1967). Section 10 of the Arbitration Act, 9 U.S.C. § 10, authorizes a district court to vacate an award "[w]here there was evident partiality or corruption in the arbitrators [.]"[5] The burden of proof in this instance rests on Local 6, as the party asserting the claim of bias. *See Saxis, supra*, 375 F.2d at 582; *Reed & Martin, Inc. v. Westinghouse Elec. Corp.*, 439 F.2d 1268, 1275 (2d Cir.1971); *UCO Terminals, Inc. v. Apex Oil Co.*, 583 F.Supp. 1213, 1214 (S.D.N.Y.), *aff'd mem.*, 751 F.2d 371 (2d Cir.1984).

## B. *Evident Partiality*

"Exactly what constitutes 'evident partiality' by an arbitrator is a troublesome question." *Morelite Const. Corp. v. N.Y.C. Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 82 (2d Cir.1984). The last Supreme Court effort to answer this question was its decision in *Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), *reh'g denied*, 393 U.S. 1112, 89 S.Ct. 848, 21 L.Ed.2d 812 (1969). In *Commonwealth*, a purportedly neutral arbitrator was discovered to have an undisclosed business relationship with the successful party to the arbitration. The arbitrator had been paid $12,000 by the successful party in consulting fees, and the relationship "went so far as to include the rendering of services on the very projects involved in [the arbitration]." *Id.* 393 U.S. at 146, 89 S.Ct. at 338.

"Justice Black, writing for a plurality of four justices, appeared [in *Commonwealth* ] to impose upon arbitrators the same lofty ethical standards required of Article III judges." *Morelite, supra*, 748 F.2d at 82 (footnote omitted). In fact, Justice Black stated that "we should, if anything, be even more scrupulous to safeguard the impartiality of arbitrators than judges, since the former have completely free rein to decide the law as well as the facts and are not subject to appellate review." *Commonwealth, supra*, 393 U.S. at 149, 89 S.Ct. at 339. Finally, Justice Black concluded that arbitrators, as well as judges, must avoid even the "appearance of bias." *Id.* at 150, 89 S.Ct. at 340.

This Court notes that "[f]our justices, however, do not constitute a majority of the Supreme Court." *Morelite, supra*, 748 F.2d at 82. In *Commonwealth*, Justice White—writing for himself and Justice Marshall—concurred in the result reached by the Supreme Court but stated clearly that the decision did not mean that arbitrators must adhere to the same ethical standards as judges. Justice White stated:

The Court does not decide today that arbitrators are to be held to the standards of judicial decorum of Article III judges, or indeed of any judges. It is often because they are men of affairs, not apart from but of the marketplace, that they are effective in their adjudicatory function. [Citation omitted]. This does not mean the judiciary must over-

---

5. Title 9 U.S.C. § 10 provides as follows:
 In either of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
 (a) Where the award was procured by corruption, fraud or undue means.
 *(b) Where there was evident partiality .or corruption in the arbitrators, or either of them.*
 (c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.
 (d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.
 (e) Where an award is vacated and the time within which the agreement required the award to be made has not expired the court may, in its discretion, direct a rehearing by the arbitrators.
 9 U.S.C. § 10 (emphasis added).

look outright chicanery in giving effect to their awards; that would be an abdication of our responsibility. But it does mean that arbitrators are not automatically disqualified by a business relationship with the parties before them if both parties are informed of the relationship in advance, or if they are unaware of the facts but the relationship is trivial.

393 U.S. at 150, 89 S.Ct. at 340.

The Second Circuit, acknowledging that the plurality and concurring opinions are not reconcilable, has concluded that "much of Justice Black's opinion must be read as dicta and we are left in the dark as to whether an 'appearance of bias' will suffice to meet the seemingly more stringent 'evident partiality' standard of 9 U.S.C. § 10." *Morelite, supra,* 748 F.2d at 83 (footnote omitted). Therefore, the Second Circuit turned to its prior decisions in order to find guidance in applying the "evident partiality" language. After considering *International Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548 (2d Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), however, the *Morelite* Court concluded that it was left "with little guidance" in "attempting to delineate standards of impartiality on a relatively clean slate." 748 F.2d at 83.

In deciding where to set the standard for finding bias on the part of arbitrators, the Second Circuit examined the competing interests of expertise and impartiality. The *Morelite* Court then reasoned that § 10(b) requires "a showing of something more than the mere 'appearance of bias' to vacate an arbitration award." 748 F.2d at 83–84 (footnote omitted). However, the Second Circuit also noted that it could not "countenance the promulgation of a standard for partiality as insurmountable as 'proof of actual bias'—as the literal words of Section 10 might suggest." *Id.* at 84. Accordingly, the *Morelite* Court held that " 'evident partiality' ... will be found where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Id.* The Court, however, declined "to set forth a list of ... relationships that will result in the *per se* vacation of an arbitration award,

except to suggest that such a list would most likely be very short." *Id.* at 85. Neither did the Second Circuit suggest that "parties to arbitration may have awards set aside by seeking out and finding tenuous relationships between the arbitrator and the successful party." *Id.* Mindful of the foregoing principles, the Court turns to the arguments underlying the instant motions.

### C. Defendant Fails to Establish "Evident Partiality"

Defendant offers a three-prong argument in support of its motion to vacate the arbitrator's award on the basis of Mordowitz's alleged "evident partiality." First, defendant contends that Mordowitz's failure to disclose the extent of his relationship with Tuchman establishes the arbitrator's evident partiality. Second, defendant relies on the relationship between Tuchman and Mordowitz, itself, to establish bias. Third, defendant argues that the purportedly improper grant of counsel fees to plaintiff by Mordowitz in his award indicates that he was "evidently partial" to plaintiff. Defendant's Reply Memorandum of Law ("D. Reply") at 6–7. For the reasons set forth below, the Court finds all three of the aforementioned arguments to be without merit.

### 1. Disclosure by the Arbitrator

"Disclosure by arbitrators should be encouraged; failure to make appropriate disclosure will justify setting aside an award." *Andros Compania Maritima v. Marc Rich & Co., A.G.,* 579 F.2d 691, 699 (2d Cir.1978) (footnote omitted). The disclosure of possible grounds for a finding of bias helps to preserve judicial integrity, and to avoid subsequent wasteful disputes and duplicative arbitration. While disclosure by arbitrators is salutary, however, courts are reluctant "to set aside arbitration awards for failure of the arbitrator to disclose a relationship with a party." *Merit Ins. Co. v. Leatherby Ins. Co.,* 714 F.2d 673, 682 (7th Cir.), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983). The Second Circuit, in particular, "ha[s] not been quick

to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose [such] information." *Andros, supra,* 579 F.2d at 700. In fact, the parties have brought only one case to the Court's attention—*Sanko S.S. Co. v. Cook Industries, Inc.,* 495 F.2d 1260 (2d Cir.1973)—in which a movant had any success in this Circuit on a claim of insufficient disclosure under these circumstances.

*Sanko,* however, is easily distinguishable from the case at bar. In *Sanko,* the movant claimed that the chairman of the arbitration panel should have disclosed two relationships, one with a company in the same line of business as the successful party to the arbitration proceeding, and the other with the successful party's counsel at the arbitration proceeding. *Id.* at 1262. These facts notwithstanding, the *Sanko* Court did not vacate the award. Rather, the Second Circuit Court merely remanded the case to the district court for further factual exploration because the record "[did] not justify a holding that Sanko [the movant] knew or should reasonably have known, of the undisclosed dealings." *Id.* at 1265.

The remaining cases in this area reveal clearly the unwillingness of the courts to overturn the awards of arbitrators for failure to disclose. For example, in *Andros,* the fact that the arbitrator, Arnold, and the president of one of the parties to the proceeding, Nelson, had served together on 19 arbitration panels, and that on 12 of said panels, Nelson had selected Arnold, was deemed, "[not the] sort of information an arbitrator would reasonably regard as creating an impression of possible bias," 579 F.2d at 701, and did not require disclosure. Moreover, in *Sofia Shipping Co., Ltd. v. Amoco Transport Co.,* 628 F.Supp. 116 (S.D.N.Y.1986), this Court held that the fact that the arbitrator "Nichols did not fully disclose his relationship with Aghelis Boulalis ... who was an employee of and a witness for Sofia [one of the parties to the arbitration proceeding, and that] Nichols failed to disclose that Boulalis was serving as an arbitrator in a number of arbitrations that involved Nichols' employer ..." was not sufficient to merit the vacatur of the

award. *Id.* at 119 (footnotes omitted). Although, the *Sofia* Court held that the "responsibility to disclose all relevant information rested on [the arbitrator and that he was] clearly at fault for neglecting to disclose the information ... [his] failure to make full disclosure ... was not so significant that it constituted 'evident partiality'." *Id.* at 121. Instead, the Court accepted the arbitrator's statement—contained in his affidavit, that he failed to disclose the possible grounds for a finding of "evident partiality" because he "simply [did] not think of it." *Id.* (footnote omitted). In a case decided by the Seventh Circuit, *Merit,* the Court of Appeals held that even an arbitrator who failed to disclose a prior business relationship with one of the parties to the proceeding, which non-disclosure may have violated "current ethical norms for commercial arbitrators, ... [constituted] at worst a technical violation that does not justify setting aside an arbitration award on the statutory ground of evident partiality." 714 F.2d at 681. Instead, the Seventh Circuit placed its faith in the "deterrent value" of an arbitrator's concern for his "professional reputation," "especially where the arbitrator is a lawyer...." *Id.* at 681.

In addition to the aforementioned cases, pragmatic policy concerns support the hesitancy by courts to vacate awards on the basis of a failure of disclosure on the part of the arbitrators. The most obvious reason for this caution is the courts' concern that "a suspicious or disgruntled party can seize" upon an undisclosed relationship "as a pretext for invalidating the award." *Commonwealth, supra,* 393 U.S. at 151, 89 S.Ct. at 340. Moreover, the Second Circuit noted that:

Courts are usually reluctant to impugn the decisions of a jury because of claims of subsequently discovered bias [citation omitted], and challenges to a judge's impartiality are typically ruled untimely when the complaining party delays an objection past the point at which he is deemed on notice of potentially disqualifying circumstances. [Citations omitted]. *Surely, even greater caution is*

*justified when the decision to be set aside is the product of the theoretically informal, speedy, and inexpensive process of arbitration, freely chosen by the parties.*

*Andros, supra,* 579 F.2d at 700–01 (emphasis added). Moreover, the courts cannot ignore the fact that "a principal attraction of arbitration is the expertise of those who decide the controversy. Expertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it, and the dividing line between innocuous and suspect relationships is not always easy to draw." *Id.* at 701.

Consistent with the concerns expressed above is Justice White's comment that an arbitrator "cannot be expected to provide the parties with his complete and unexpurgated business biography." *Commonwealth, supra,* 393 U.S. at 151, 89 S.Ct. at 340. Moreover, such intimacy suggests that "the parties can justifiably be held to know at least some kinds of basic information about an arbitrator's personal and business contacts." *Andros,* 579 F.2d at 701. Mindful of these precedents and policies, the Court turns to the record before it.

■ Defendant argues first that the award should be vacated because Mordowitz failed to disclose certain relevant information regarding his alleged relationship with plaintiff's counsel, Strashun, via Strashun's purported relationship with Tuchman. It is undisputed that Mordowitz had a former attorney-client relationship with Tuchman. However, Mordowitz denies any knowledge of Tuchman's involvement with the instant litigation. Mordowitz Aff. at ¶ 6. Moreover, while defendant does provide additional details regarding the Mordowitz-Tuchman relationship, *see* Laufer Aff., Exs. M, N and P, said details fail to provide evidence that impeaches or contradicts Mordowitz's statements regarding his absence of knowledge in connection with Tuchman's relationship to the instant case.[6]

■ Strashun's relationship to Tuchman, through which Strashun is allegedly tied to Mordowitz, is described fully in Strashun's affirmation. *See* Strashun Aff. II. Strashun concedes being listed as "of counsel" on Tuchman's letterhead, but asserts that all correspondence with Mordowitz was sent on Strashun's own letterhead. *Id.* at ¶¶ 6–7; *see also id.* Exs. D and E. Moreover, Strashun and Tuchman maintain entirely separate law firms; each firm is located in a different office, maintains a different telephone number, engages in independent billing practices, files separate tax returns and employs different staff. *Id.* at ¶ 6. Furthermore, although Strashun concedes that his wife works with Tuchman and that she assisted Strashun by providing research support for the papers filed in the instant litigation, *id.* at ¶ 21, the Court finds that such a connection is not sufficiently significant to warrant disclosure, even assuming Mordowitz's knowledge of said connection.

Finally, with respect to any direct relationship between Mordowitz and Strashun, Mordowitz states, in his affidavit, that he met Strashun for the first time on the day of the scheduled arbitration hearing and that he does not have a business or social relationship with Strashun. Mordowitz Aff. at ¶ 3.

Accordingly, the Court rejects defendant's argument that Mordowitz actually knew of the Strashun-Tuchman connection. Thus, Mordowitz's alleged "failure to disclose" does not establish the "evident partiality" necessary to merit the vacatur of the award underlying the instant dispute. *See Andros, supra,* 579 F.2d at 700–02; *Sofia, supra,* 628 F.Supp. at 119; *Merit, supra,* 714 F.2d at 682–03.[7]

---

**6.** As a general matter, the evidence provided by the parties in their submissions is sufficient to allow this Court to determine the nature and extent of the relevant relationships without an evidentiary hearing. It is to be noted that the defendant, itself, has withdrawn a request for further discovery and the deposing of Mordow-

itz. Letter from Jacob Laufer to the Court, dated February 11, 1987. Court Ex. A.

**7.** The Court also declines to accept defendant's argument charging Mordowitz with constructive knowledge. Such an argument must be rejected in cases involving arbitrator disqualification because "[i]mputing knowledge of potentially prej-

#### 2. The Relationship Between Tuchman and Mordowitz

The Second Circuit has rejected the formulation of *per se* rules and recognized the need for case-by-case examination under the reasonableness standard when examining allegedly biased relationships. *See Morelite, supra,* 748 F.2d at 84–5; *Andros, supra,* 579 F.2d at 700. "To set aside an award for arbitrator partiality, '[t]he interest or bias ... must be direct, definite and capable of demonstration rather than remote, uncertain, or speculative.'" *Sidarma Societa Italiana v. Holt Marine Industries, Inc.,* 515 F.Supp. 1302, 1307 (S.D.N.Y.), *aff'd,* 681 F.2d 802 (2d Cir.1981) (quoting *Tamari v. Bache Halsey Stuart Inc.,* 619 F.2d 1196, 1200 (7th Cir.), *cert. denied,* 449 U.S. 873, 101 S.Ct. 213, 66 L.Ed.2d 93 (1980)); *see also Sofia, supra,* 628 F.Supp. at 119. The appearance of bias does not satisfy the standard of "evident partiality." *International Produce, supra,* 638 F.2d at 551; *Morelite, supra,* 748 F.2d at 83. Instead, in evaluating the purported bias of an arbitrator, the courts look at: (1) the financial interest the arbitrator has in the proceeding; (2) the directness of the alleged relationship between the arbitrator and a party to the arbitration proceeding; (3) and the timing of the relationship with respect to the arbitration proceeding.

As noted above, the first issue courts examine when evaluating the alleged bias of an arbitrator is whether the arbitrator has a financial interest in the arbitration proceeding. *See, e.g. Commonwealth, supra,* 363 U.S. at 147–48, 89 S.Ct. at 338–39; *Reed & Martin, supra,* 439 F.2d at 1275; *Ballantine Books, Inc. v. Capital Distributing Co.,* 302 F.2d 17, 21 (2d Cir. 1962); *Andros, supra,* 579 F.2d at 700–01; *Arbitration: Ilios S. & T. Corp. and American A. & B.C.C.,* 148 F.Supp. 698, 700 (S.D.N.Y.), *aff'd,* 245 F.2d 873 (2d Cir.

1957). In *Sidarma,* plaintiff—in an attempt to prove bias—presented the Court with a letter written by one of the three arbitrators indicating that the arbitration decision should "[not pierce] the 'Corporate Veil' concept [because] it is a vital part of *our industry....*" 515 F.Supp. at 1306 (emphasis added). The *Sidarma* Court noted first that

> there is a possibility, perhaps even a substantial likelihood, that any given arbitrator's views of what is good for the industry will be colored by the arbitrator's personal business experience. It may even be that, in considering the well-being of the industry generally, the arbitrator *will perceive some future benefit to his or her personal business ventures that may result from the precedent established by the arbitration award.*

*Id.* at 1307 (emphasis added). However, the Court then concluded that "[t]his alone, ... does not constitute the 'evident partiality' section 10(b) requires before an arbitration award can be disturbed." *Id.* Similarly, in *Sofia,* the District Court rejected defendant's claim of bias upon the Court's finding that the arbitrator lacked any direct interest—financial or otherwise—in the outcome of the arbitration proceedings pending before him. 628 F.Supp. at 120.

Finally, in *Greater New York Health Care Facilities Assn., Inc. v. Hotel, Hospital, Nursing Home and Allied Services Union, Local 144,* 492 F.Supp. 578 (S.D.N.Y.1980), the Court went so far as to allow an arbitrator to determine his own eligibility to arbitrate a proceeding even though he had a "pecuniary interest in the outcome of the ... dispute—his continued employment as arbitrator." *Id.* at 579. Moreover in *Greater New York Health Care,* as in the case at bar, the arbitration agreement was silent "about the arbitrator deciding a dis-

---

udicial information runs contrary to the logic underlying the disqualification rule, since it is only actual knowledge which can affect the decision-making process." *Overseas Private Investment Corp. v. Anaconda Co.,* 418 F.Supp. 107, 112 n. 7 (D.D.C.1976) (the Court refused to find that the arbitrator had "legal" or "construc-

tive" knowledge of the relationship of a law firm to the arbitration proceedings—with which firm the arbitrator had conducted negotiations concerning possible employment—even though the firm had been referred to in the arbitration record).

pute in which he may have a pecuniary interest."[8] The Court stated that

[i]t is apparent that the parties, in negotiating the bargaining agreement, were dealing at arms length. Since they addressed the possible substitution of the arbitrator but chose to be silent with respect to his pecuniary interest, I must give effect to the plain terms of the bargaining agreement. Thus, I have no choice but to conclude that the question of whether an arbitrator with a pecuniary interest should hear the arbitration is itself an arbitrable dispute....

*Id.* at 580.

In the instant case, it is undisputed that Mordowitz did not have any pecuniary interest in the subject matter of the arbitration. Mordowitz Aff. at ¶ 5. Accordingly, this factor fails to provide support for defendant's motion for vacatur.

The next issue courts often examine in deciding the question of bias on the part of the arbitrator is the nature of the relationship, if any, between the arbitrator and either a party to the arbitration or counsel for one of the parties. In *International Produce,* the Court held that the fact that a neutral arbitrator in one dispute was also a non-party witness in another dispute involving the same law firms did not require his disqualification. 638 F.2d at 551–52.

In the instant action, there is no direct relationship between the arbitrator and counsel representing the plaintiff in the arbitration proceeding. Defendant's claim that Strashun is intimately involved with Tuchman, due to his listing as "of counsel" on Tuchman's stationery, is unconvincing because the law in this Circuit is clear that

[i]t does not follow that an arbitrator's personal feelings in favor of or against one attorney would necessarily be transferred to another attorney in the same firm. Our situation is thus *radically different* from that of an arbitrator who has close personal dealings with the very same attorney who is arguing before the arbitrator.

*Id.* at 551 n. 3 (citing *Sanko, supra,* 495 F.2d at 1260) (emphasis added). Defendant's additional claim regarding Strashun's wife's is equally unavailing. Ms. Strashun states that she has never had any social, financial, or business ties with Mordowitz. Affidavit of Brenda Pilchick Strashun, Esq., sworn to on November 12, 1986 at ¶ 3.

The last factor considered by the courts is the "timing" of the relationship which allegedly demonstrates "evident partiality." The Court notes that "the mere fact that there is some business relationship between the arbitrator and one of the parties to the arbitration is not in and of itself sufficient to disqualify the arbitrator." *Ilios, supra,* 148 F.Supp. at 700 (citation omitted). For example, in *Oversees,* the Court found that the relationship between the arbitrator and a law firm—that may have somehow been involved in the arbitration proceedings—did not meet the burden necessary for bias. The Court relied on the fact that "[t]he pattern of the meetings [bore] no correspondence to crucial dates in the arbitration," 418 F.Supp. at 111, and those meeting dates were weeks or months but not more than a year prior to the arbitration. Similarly, in *Sofia,* the District Court, in rejecting defendant's claim

---

**8.** The arbitration provisions in *Greater New York Health Care* read as follows:

All complaints, disputes, controversies or grievances arising between the parties hereto involving questions of interpretation or application of any clause of this agreement, or any acts, conduct or relations between any of the parties hereto and/or between the Union and any employer, directly or indirectly, which shall not have been adjusted by and between those involved shall be submitted to the Impartial Chairman hereinafter mentioned for arbitration and his decision shall be final and binding upon the parties hereto.

\* \* \* \* \* \*

Should the Impartial Chairman resign, refuse to act or be incapable of acting, or should the office become vacant for any reason whatsoever, the Association and the Union shall immediately and within five (5) days after the occurrence of such vacancy designate another person to act as such Impartial Chairman. If they fail to agree upon the designation, it shall be submitted to the New York State Board of Mediation for its selection of a person to serve as Impartial Chairman, and the parties hereto agree to accept its designation.

492 F.Supp. at 578–80.

of bias, focused on the timing issue by stating that

> [t]he panel in the instant case did not render its decision until 1985. Boulalis [employee witness for petitioner] stopped working for the petitioner in 1983, approximately two years before the panel issued its opinion. It would be unreasonable for the Court to assume that [the arbitrator] voted for the petitioner in order to curry favor with Boulalis, when Boulalis was not even employed by the petitioner at the time of the decision.

628 F.Supp. at 120.

In the case at bar, it is clear that the attorney-client relationship between Mordowitz and Tuchman ended more than a year prior to the arbitration proceeding. Mordowitz Aff. ¶ 6. Such a relationship does not militate in favor of the vacatur of Mordowitz's award.[9]

### 3. *Award of Counsel Fees as Evidence of Bias*

Defendant's final argument is that Arbitrator Mordowitz's award of counsel fees manifests bias. This argument is as untenable as those preceding it.[10]

When a claim of partiality is made, courts are obliged to scan the record to see if it demonstrates "evident partiality" on the part of the arbitrator. Defendant argues that the arbitration award indicates that the arbitrator was biased because said award is outside the "essence" of the collective bargaining agreement. *United Steelworkers of America v. Enterprise Wheel & Car*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). As support for its position, defendant cites *J.P. Greathouse Steel Erectors, Inc. v. Blount Bros. Construct. Co.*, 374 F.2d 324 (D.C. Cir.), *cert. denied* 389 U.S. 847, 88 S.Ct. 64, 19 L.Ed.2d 116 (1967), in which the Circuit Court for the District of Columbia vacated an arbitration panel's award of counsel fees. This Court finds *J.P. Greathouse* to be inapposite.

In *J.P. Greathouse*, the Circuit Court vacated the award because the arbitrators clearly exceeded their authority under the agreement by ruling on issues of law, as well as issues of fact, despite the fact that the arbitration provision covered only questions of fact.[11] The Circuit Court then noted that the arbitrators' award of counsel fees—fees incurred in seeking to enforce contractual provisions—was improper because what defendant was seeking to enforce was not a provision of the contract. Rather, counsel fees were incurred in seeking to enforce an award that was not authorized by the underlying agreement.

 The instant action is easily distinguished from *J.P. Greathouse*. The wording of the arbitration clause underlying this dispute is broad in scope, *see Ottley v. Sheepshead Nursing Home*, 688 F.2d 883, 886–87 (2d Cir.1982)[12], in contrast to that found in *J.P. Greathouse*. While Mordowitz's granting of fees may arguably not

---

**9.** The Court also notes that the fact that Local 6 has used Mordowitz previously in other arbitration proceedings, Mordowitz Aff. at ¶ 8, and that Local 6 has received awards in the past in its favor from Mordowitz, undercuts its claim of the "evident partiality" of Mordowitz.

**10.** The Court notes that defendant fails to attack the merits of the award. In so doing, defendant has narrowed the scope of this Court's investigation of the award. This Court need look only to the "substantive aspects of the award as evidence of bias [and not to the merits of the award]." D. Reply at 7, n. 1.

**11.** The provision in *J.P. Greathouse* read as follows:

> If any question of fact shall arise under this contract ... either party hereto may demand an arbitration....

374 F.2d at 325.

**12.** In *Ottley* the provision reads as follows:

> *All* complaints, *disputes*, controversies or grievances arising between the parties hereto involving questions of *interpretation or application of any clause of this agreement, or any acts, conduct or relations* between any of the parties hereto and/or between Union and any Employer, *directly* or *indirectly*, which shall not have been adjusted by and between those involved shall be submitted to the Impartial Chairman hereinafter mentioned for arbitration and his decision shall be final and binding upon the parties hereto.

688 F.2d at 886 (emphasis added by *Ottley* Court). The above language is identical to that contained in Section 8(A) of the Agreement underlying the instant dispute. *See* Strashun Aff. Ex. A.

have been proper under the Agreement—due to the reluctance of courts to enforce counsel fees award unless specifically stated in the agreement, *International Chem. Workers Union, Local 227 v. BASF Wyandotte Corp.,* 774 F.2d 43, 47 (2d Cir.1985)—an arbitrator's decision will not be set aside on direct review regardless of whether he misinterpreted either the facts or the law. This principle applies to an arbitrator's alleged misinterpretation of a contract. *International Union of Elevator Constructors v. National Elevator Indus., Inc.,* 772 F.2d 10, 12 (2d Cir.1985) (citing *Enterprise, supra,* 363 U.S. at 599, 80 S.Ct. at 1362).

■ The Court finds that Mordowitz's award is clearly "colorable" based on the ambiguous terminology [13] contained in section 2(C) of the Agreement and therefore, said award does not indicate any bias. *See Sofia, supra,* 628 F.Supp. at 118 (citing *John T. Brady & Co. v. Form-Eze Systems, Inc.,* 623 F.2d 261, 264 (2d Cir.), *cert. denied,* 449 U.S. 1062, 101 S.Ct. 786, 66 L.Ed.2d 605 (1980)).

### CONCLUSION

For the aforementioned reasons, Sanford's motion to confirm the arbitration award is granted; Local 6's motion for vacatur is denied.[14]

SO ORDERED

---

13. Section 2(C) of the Agreement provides as follows:

The Union agrees to indemnify and hold the Emploeyr [sic] harmless against any and all actions, claims, suits, damages or *expenses* incurred by reason of discharge effected at the request of the Union.

Strashun Aff., Ex. A (emphasis supplied).

14. Both sides in the instant case have moved for imposition of sanctions and counsel fees under Rule 11 of the Federal Rules of Civil Procedure. Rule 11 allows the imposition of sanctions against attorneys or parties for suits filed in bad faith. Similarly, the equitable powers of federal courts allow them to award counsel fees when "opposing counsel acts 'in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *International Chem. Workers, supra,* 774 F.2d at 47 (quoting *F.D. Rich Co. v. United States ex rel. Industrial Lumber Co.,* 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974)). The federal courts have broad discretion in deciding whether to grant sanctions under Rule 11. *Woodcrest Nursing Home v. Hotel, Hospital, Nursing Home and Allied Services Union, Local 144,* 788 F.2d 894, 899 (2d Cir.1986).

As noted above, the present controversy could have been resolved much earlier through the disclosure of the relationships among the various actors. Such disclosure would have deprived defendants of an arguable reason to vacate. However, in the absence of such disclosure and because neither side of the present dispute is blameless in having failed to avoid these problems through disclosure and accountability, their respective applications under Rule 11 are denied.