**In the Matter of the Arbitration Between SUN REFINING & MARKETING COMPANY, Petitioner,**

v.

**STATHEROS SHIPPING CORPORATION OF MONROVIA, LIBERIA (Mayamar Marine Enterprises, Piraeus, Greece, Managers) as Owners of the M/S STATHEROS, Respondent.**

**No. 90 Civ. 8192 (MBM).**

United States District Court, S.D. New York.

April 8, 1991.

Patrick V. Martin, Carlos E. Rameh, Hill Rivkins Loesberg O'Brien Mulroy & Hayden, New York City, for petitioner.

Christopher H. Mansuy, Elena M. Desantis, Walker & Corsa, New York City, for respondent.

## OPINION AND ORDER

MUKASEY, District Judge.

Petitioner Sun Refining and Marketing Company moves pursuant to section 10 of the United States Arbitration Act, 9 U.S.C. § 10 (1990) (the "Act"), to vacate an arbitration award by two of three arbitrators on a panel in New York, pursuant to the Arbitration Rules of the Society of Marine Arbitrators, Inc. The award arose from an alleged shortage in a cargo of fuel oil loaded onto a tanker owned by respondent Statheros Shipping Corporation of Monrovia, Liberia and chartered by Sun. Petitioner seeks an order vacating that award because of the panel chairman's alleged "evident partiality" within the meaning of § 10 of the Act. For the reasons set forth below, the motion is granted.

### I.

Because the outcome of any inquiry into an arbitrator's alleged "evident partiality" depends on the particular facts and circumstances of each case, *Morelite Const. Corp. v. New York City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 81 (2d Cir.1984), the events surrounding Sun's motion are set forth in detail below.

The contested arbitration award arose from Sun's allegation that Statheros was responsible for a shortage of fuel oil totalling 2,397 barrels—the amount Sun loaded on the tanker Statheros in Scotland on September 29, 1983 less the amount discharged in the United States on October 14, 1983. The parties submitted the dispute to arbitration pursuant to a clause in the charter party. That clause provided that each side select one arbitrator who would in turn select the third arbitrator. On September 28, 1984, Sun named Vincent E. Dour as arbitrator. On or about January 11, 1985, Statheros named Manfred Arnold.

Shortly thereafter, Dour encountered Arnold at a meeting of the Society of Maritime Arbitrators and suggested that they appoint Hans Proeller as the third arbitrator. He did not consult Sun before making this suggestion. Dour had known Proeller from "some past business relationships and felt that he was an experienced, competent person in the maritime field." Dour Affidavit ¶ 7. Arnold, who also knew Proeller, agreed to the choice. At the time, Proeller was President of Fritzen–Halcyon Lijn, Inc., which was the New York agent for an entity known as the Fritzen Group of Emden, Germany. Fritzen Group's business activities included the ownership of several oil tankers. Proeller Affidavit ¶ 1; Murphy Affidavit ¶ 5–6.

Shortly after their informal conversation at the Society meeting, but before January 19, 1985, either Dour or Arnold contacted Proeller to ask if he would accept appointment as Chairman of the panel to hear the dispute between Sun and Statheros. Neither Dour nor Proeller can recall whether Dour or Arnold contacted Proeller. Dour Affidavit ¶ 8; Proeller Affidavit ¶ 4. Dour contends that one or the other told Proeller the names of the parties and the nature of the dispute. Dour Affidavit ¶ 8. This assertion about the initial conversation with Proeller is curious and may well constitute inadmissible hearsay because Dour is not sure if he was the arbitrator who first spoke with Proeller. *Id.* Sun does not claim that Proeller actually was asked if he had any potential conflicts. *Id.* It asserts only that Proeller accepted the invitation without volunteering such information. *Id.* Proeller himself cannot recall the discussion in detail, but avers that he usually discloses potential conflicts only at the time of the first arbitration hearing, rather than at the time of the invitation, and directly to the parties, rather than to one of the partisan arbitrators. Proeller Affidavit ¶ 5. Thus, Proeller appears to concede that he did not disclose any potential conflicts before accepting the invitation to join the panel.

Dour confirmed Proeller's appointment as Chairman by letter dated January 19, 1985 with a carbon copy to Thomas Murphy, Esq. of Sun. Dour Affidavit, Exh. C. Murphy is Sun's in-house counsel responsible for international and maritime matters—including the dispute between Sun and Statheros. Murphy Affidavit ¶ 1. After receiving this letter, Murphy telephoned Dour and asked him whether he had been aware that Proeller was then involved in a separate arbitration between Sun and Fritzen Group. Dour told Murphy both that he was unaware of this fact and that, had he known, he would not have selected Proeller. Dour Affidavit ¶ 9; Murphy Affidavit ¶ 11.

The separate arbitration between Sun and Fritzen Group arose from Sun's alleged breach of a contract dated February 8, 1980 in which Sun had agreed to charter tankers owned by Fritzen Group for voyages between Africa and the United States. As noted above, Proeller was president of Fritzen–Halcyon Lijn, Inc., the New York agent of Fritzen Group. As agent, Proeller negotiated and signed the contract with Sun on behalf of Fritzen Group. Murphy Affidavit ¶ 5–6. Shortly thereafter, Sun decided that changed economic conditions in the oil business obviated its need for Fritzen Group's tankers. *Id.* A dispute then arose over whether Sun had breached the charter party and, if so, the extent of Fritzen Group's actual damages arising from that breach. Murphy Affidavit ¶ 7. Fritzen Group commenced an arbitration proceeding that lasted from March, 1982 until October, 1987. *Id.*

Proeller actively participated in that arbitration both as Fritzen Group's agent and as a witness. On September 8, 1982, he testified "at length concerning his involvement with, and extensive knowledge of, the charter and the reasons for the various clauses." Murphy Affidavit ¶ 7. In particular, Proeller informed Sun by letter dated March 5, 1985—less than two months after accepting the invitation to chair the panel hearing the Sun–Statheros dispute—that Fritzen Group would seek total damages of $6,948,790. Murphy Affidavit, Exh. C. Proeller asserts that "[w]hile I was involved in managing some of the details of the charter between Sun and the German

principal of my employer and participated in the Sun–Fritzen arbitration in New York, I had no personal financial interest or stake in the outcome of that arbitration and received no monetary benefit from Sun's performance of the charter or award against Sun." Proeller Affidavit ¶ 2. Sun asserts that Proeller's involvement in the arbitration was actually more extensive than the above quotation might indicate,[1] but the company does not dispute Proeller's claim that he had no direct financial stake in the outcome of that arbitration. In a unanimous opinion dated October 2, 1987, the Sun–Fritzen Group arbitration panel ultimately awarded Fritzen Group damages of $1,983,720.70 and interest of $688,808.65, for a total award of $2,672,-529.35. Murphy Affidavit, Exh. A at 61. It appears that the panel previously had issued a "partial final award," but the papers submitted with this motion do not explain if that interim award contained damages separate from those set forth in the October 2, 1987 award. *Id.* at 39.

After learning of Proeller's appointment to the Sun–Statheros panel, Murphy telephoned Proeller and asked him to step aside because of his involvement in the separate, but ongoing, arbitration between Sun and Fritzen Group. Proeller refused to withdraw voluntarily because he saw no connection between the two matters and felt that he could hear the Sun–Statheros arbitration in a fair and unbiased manner. On March 13, 1985, approximately two months after Proeller accepted the appointment to the Sun–Statheros panel, but before those hearings commenced, Murphy wrote Proeller and again asked him to withdraw down from that panel. In this letter, Murphy cited both Proeller's "intimate[ ] involve[ment]" in the separate, but ongoing, Sun–Fritzen Group arbitration and the fact, discussed above, that Proeller had written Sun only a week earlier to inform the company that Fritzen Group would seek damages of more than $6.9 million in that arbitration. Murphy Affidavit, Exh. C. Murphy also noted, presciently, that because the Sun–Statheros arbitration had not yet commenced, Proeller could save the parties the time and expense of later litigation by withdrawing then. *Id.* By letter dated March 22, 1985, Proeller responded by again reiterating that he would be neutral and impartial in his capacity as arbitrator in the Sun–Statheros proceeding, notwithstanding his involvement in the ongoing Sun–Fritzen Group arbitration.

The first hearing of the Sun–Statheros arbitration panel was held on July 12, 1985. At the hearing, all three arbitrators fully disclosed their past and current relationships with the parties or their attorneys. Proeller formally and publicly disclosed his involvement in Sun's arbitration with Fritzen Group—of which Sun was already fully aware—but yet again reiterated his belief that he could serve as an unbiased and impartial arbitrator. Murphy affidavit, Exh. D, Transcript at 11. Murphy reiterated Sun's continued objection to Proeller's presence and also reserved the company's right to challenge any award in the future. Murphy affidavit, Exh. D, Transcript at 14–15.

When it became evident that Proeller's presence was still disputed, both Murphy and Statheros' attorney agreed to suspend the hearing so that the parties could seek judicial resolution of the matter. Murphy affidavit, Exh. D, Transcript at 15–16. On July 25, 1985, Statheros filed a motion to compel arbitration. Murphy Affidavit, Exh. E. However, on September 4, 1985, Statheros withdrew the motion without prejudice because it was premature.[2] Murphy Affidavit, Exh. F.

---

1. Murphy has described Proeller's role in the Sun–Fritzen Group arbitration as follows:

   "Mr. Proeller was, as a practical matter, our main protagonist [*sic*], testified extensively on behalf of the Fritzen Group and was deeply involved with their tactics and strategy."
   Murphy Reply Affidavit at 2.

2. *See Sanko S.S. Co. v. Cook Industries, Inc.,* 495 F.2d 1260, 1264 n. 4 (2d Cir.1973) ("refusal by the panel to compel an allegedly partial arbitrator to step down will generally be reviewable by a district court only after an award has been made"); *Marc Rich & Co. v. Transmarine Seaways Corp.,* 443 F.Supp. 386, 387–88 (S.D.N.Y. 1978) (Arbitration Act does not permit party to

Thereafter, the Sun–Statheros arbitration continued with Proeller as Chairman. Before arbitration began, Sun had requested damages totalling $211,000. However, Sun's claim fluctuated from $84,065 at the beginning of the hearings, to $109,582, and then to a final request of $66,183. Petition to Vacate Arbitration Award, Exh. A at 3–4 & n. 3; Proeller Affidavit ¶ 5.

As mentioned, the Sun–Fritzen Group arbitration concluded on October 2, 1987 and that panel unanimously ordered Sun to pay Fritzen Group about $2.7 million in damages and interest. By letter dated September 23, 1988, Proeller reminded Murphy that the Sun–Fritzen Group arbitration was now complete and reiterated his intention to be unbiased in the separate Sun–Statheros hearing. Proeller Affidavit, Exh. 1. Murphy reiterated his objection. Proeller Affidavit, Exh. 2.

The Sun–Statheros panel deliberated on April 17, 1990 and rendered its award on September 28, 1990. Dour Affidavit ¶ 1, 12. As noted, Sun's final claim amounted to $66,183. In their majority decision, Proeller and Arnold awarded Sun damages of $20,022 and interest of $8,901. Petition to Vacate Arbitration Award, Exh. A at 26. In particular, the majority disallowed a portion of Sun's claim relating to 1,280 barrels of crude oil allegedly lost in transit and also found that Sun failed to prove that the tanker was unseaworthy. Dour heatedly dissented. He argued that Sun had proved both its claim for oil lost in transit and its claim that the ship was unseaworthy; Dour described the ship as a "real dog." At the end of the dissent, Dour alluded to what he

perceived to be the pro-shipper bias of Arnold and Proeller,[3] but did not accuse Proeller of any particular bias against Sun. Petition to Vacate Arbitration Award, Exh. A, Dour dissent.

In addition to a majority and dissenting opinion, the final award also contained an appendix that detailed the panel's fee for rendering its award. The appendix fixed total fees of $19,950, payable to arbitrators Arnold and Proeller in the amount of $7,625 each, and to the dissenter Dour in the amount of $4,700. The appendix also directed that Sun pay 60% of the total fee, Statheros 40%. Petition to Vacate Arbitration Award, Exh. A, Appendix C. Sun contends that both orders were "contrary to the usual practice in this type of arbitration." Sun's Memorandum of Law at 6.

At the time he wrote his dissent, Dour was aware of the panel's findings with respect to damages, because Proeller had sent him a draft of the majority opinion on August 24, 1990. Dour Affidavit ¶ 14. Dour states that a cover letter that accompanied the draft indicated panel fees would be between $4,000 and $5,000 per arbitrator. *Id.* Dour told Proeller that he agreed with that estimate. *Id.* There was apparently no mention in the letter of how the fees would be allocated. On September 26, 1990, Proeller sent Dour a copy of the award to be signed. Dour Affidavit ¶ 15. That copy did not contain the appendix setting forth the Panel's fees. *Id.* However, Dour signed the opinion anyway and returned it to Proeller with his dissent attached. *Id.* Dour was "greatly surprised and chagrined" when, upon receiving a

---

bring action seeking disqualification prior to arbitration award).

**3.** In particular, Dour concluded his dissent with the following two paragraphs:

"I am again reminded of the study which Donald Bruce, formerly of Cities Service, performed some years back. He made an exhaustive study of cargo loss claims up to that time and came up with merely two or three decisions in favor of charterers in such matters, the other twenty or so awards going in favor of owners. This is hardly 'arbitration'— what we had here were bad/slanted [*sic*] decisions never challenged that were almost always in favor of the owner.

Evidently it appears this situation will continue. It is for this reason, I believe, that some of the larger oil companies have now decided to submit their disputes to the American Arbitration Association rather than the [Society of Marine Arbitrators] where sympathies lie with shipowners. I personally have noted this recent change in charter parties and hope this trend continues and oil companies perhaps some day will have their disputes truly 'arbitrated' and not just settled by two tankermen [*sic*] out of three arbitrators." Petition to Vacate Arbitration Award, Exh. A, Dour dissent.

copy of the full decision actually mailed to the parties, he learned that the appendix contained both an upward adjustment—to $7,650—in the fees of the other two arbitrators only, and a direction that Sun pay 60% of the total fees. *Id.* Dour insists that the other two arbitrators failed to inform him either of the increase in their individual fees or that Sun would be paying 60%, and that he would not have agreed to either action had he been consulted. *Id.* Dour also contends that Proeller's and Arnold's individual fees were not "reasonable given the amount of time and effort involved in deciding this relative [*sic*] routine claim." *Id.* Sun contends that both of the orders with respect to fees were "contrary to the usual practice in this type of arbitration." Sun's Memorandum of Law at 6.

In his own affidavit, Proeller alleges that he and Arnold decided to allocate the panel's fee unequally because Sun had made the proceedings "more lengthy" by repeatedly revising the amount of its claims against Statheros. Proeller Affidavit ¶ 5. Proeller also implies that he and Arnold deliberately failed to inform Dour of their intent to order an unequal fee allocation when he avers that "[g]iven the tone of Mr. Dour's dissent, he does not and would not have agreed to this unequal allocation of arbitrator's fees." Proeller Affidavit ¶ 5. Proeller does not explain in his affidavit exactly when the majority decided on the unequal allocation—before or after receiving Dour's dissenting opinion—nor does he explain when or why they decided to raise their own fees but not Dour's. However, Proeller leaves undisputed the claim that Dour was not told of either the allocation of total fees or the increase in Proeller's and Arnold's individual fees until after the decision was actually released on September 28, 1990.

Arnold has submitted a short affidavit which adds little to the above rendition of facts. He does not specify whether it was he or Dour who first contacted Proeller. Arnold does aver that he "observed no instance whatsoever which caused me to consider that ... Proeller was biased or predisposed against Sun...." Arnold Affidavit ¶ 4 (included in Proeller Affidavit,

Exh. 2). He also adds that he has "been involved in numerous cases over the last 10–15 years in which arbitrators have assessed their individual fees on an unequal basis. It would be appropriate to state that this trend has developed more recently and has become an accepted practice." *Id.*

Sun has paid the arbitration fees in accordance with the majority's direction. Proeller Affidavit ¶ 6.

Sun filed its motion to vacate the damage award on December 21, 1990. It seeks to vacate the award solely on the ground of Proeller's "evident partiality." Petition to Vacate Arbitration Award ¶ 13.

### II.

When parties have selected arbitration, "the role of the courts is limited to ascertaining whether there exists one of the specific grounds for the vacation of an award provided in § 10 of the Arbitration Act." *Saxis Steamship Co. v. Multifacs Int'l Traders, Inc.*, 375 F.2d 577, 581 (2d Cir.1967). Furthermore, the party challenging an arbitral award has the burden of proving the existence of grounds to vacate. *Id.* at 582; *Hunt v. Mobil Oil Corp.*, 654 F.Supp. 1487, 1497–98 (S.D.N.Y.1987) (Weinfeld, J.).

Section 10(b) permits a court to vacate an arbitration award "[w]here there was evident partiality ... in the arbitrators, or either [*sic*] of them." 9 U.S.C. § 10(b) (1990). In determining whether there is "evident partiality," courts pragmatically "employ[ ] a case-by-case approach in preference to dogmatic rigidity." *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691, 700 (2d Cir.1978).

"Courts are reluctant to set aside an award based on a claim of evident partiality, and will do so only if bias of the arbitrator is direct and definite; mere speculation is not enough."

*Sofia Shipping Co., Ltd. v. Amoco Transport Co.*, 628 F.Supp. 116, 119 (S.D.N.Y. 1986) (citations omitted).

In particular, courts have recognized that one of the primary values of arbitration— the expertise and experience of individual

arbitrators that comes from involvement in what may be a relatively small and tight-knit occupation—may also lead to charges of possible bias. As the Second Circuit stated in *Morelite Const. Corp. v. N.Y. Dist Council Carpenters Benefit Funds:*

"[P]arties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute.... Familiarity with a discipline often comes at the expense of complete impartiality. Some commercial fields are quite narrow, and a given expert may be expected to have formed strong views on certain topics, published articles in the field and so forth. Moreover, specific areas tend to breed tightly knit professional communities. Key members are known to one another, and in fact may work with, or for, one another, from time to time. As this Court has noted, '[e]xpertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it ...'.... [T]o disqualify any arbitrator who had professional dealings with one or of the parties (to say nothing of a social acquaintanceship) would make it impossible, in some circumstances, to find a qualified arbitrator at all."

*Morelite*, 748 F.2d at 83 (quoting *Andros Compania*, 579 F.2d at 701 (2d Cir.1978)). *See also Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 150–51, 89 S.Ct. 337, 340, 21 L.Ed.2d 301 (1968) (White, J., concurring).

■ Accordingly, under the Arbitration Act, a party must show something more than "appearance of bias" to vacate an award because of an arbitrator's alleged "evident partiality." *Morelite*, 748 F.2d at 83–84. At the same time, however, federal courts have an obligation to maintain the integrity of their own role in the arbitration process when a party makes either a motion to confirm or award or, as here, to vacate an award because of "evident partiality." *Id.* at 84. Therefore, because it is usually impossible to prove "outright chicanery," *Commonwealth Coatings*, 393 U.S. at 150, 89 S.Ct. at 340 (White, J., concurring), the challenging party is not

required to show "proof of actual bias." *Morelite*, 748 F.2d at 84.

To vacate an award because of "evident partiality," the challenging party has the burden of showing that "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Id.* In *Morelite*, the Second Circuit vacated an award when there was a father-son relationship between an arbitrator and an officer of the union which was a party to the arbitration. Taking a common sense view of father-son relationships, the Court stated that "[w]e cannot in good conscious allow the entering [*sic*] of an award grounded in what we perceive to be such unfairness." Id. at 84. *Morelite* declined to set forth a list of relationships and circumstances which would constitute *per se* examples of evident partiality, and recognized that courts should take a pragmatic approach "cognizant of peculiar commercial practices and factual variances." *Id.*

■ When evaluating the purported bias of an arbitrator, courts examine such factors as: (1) the financial interest the arbitrator may have in the proceeding; (2) the directness and nature of the alleged relationship between the arbitrator and a party to the proceeding; and (3) whether the relationship existed at the same time as the challenged proceeding. *Sanford Home For Adults v. Local 6, IFHP*, 665 F.Supp. 312, 320 (S.D.N.Y.1987). In particular, courts are more likely to find "evident partiality" where the claim of possible bias arises from a "business relationship" between an arbitrator and a party rather than from a "professional relationship." *Andros Compania*, 579 F.2d at 701.

### III.

Sun and Statheros vehemently dispute whether Proeller was required to make full disclosure of his business relationship with the parties—particularly his extensive involvement in the ongoing arbitration against Sun—before accepting an invitation to be an arbitrator on the Sun–Statheros panel. But that issue is really beside the point of this case.

Proeller formally disclosed his relationship at the first arbitration hearing, but refused to step aside because, according to him, he would be completely unbiased, notwithstanding his involvement in the ongoing arbitration between Sun and Fritzen Group. Of course, Sun was already aware of this involvement because it had asked Proeller to withdraw even before the first hearing when it learned of his appointment. Sun argues that the award should be vacated automatically because Proeller failed to disclose his relationship with Sun at the time he was invited to sit—when Arnold and Dour had an opportunity to select a different arbitrator. Essentially, Sun argues that Proeller's failure to disclose before joining the panel was the equivalent of failing to make any disclosure.

■ Federal common law requires that an arbitrator make full disclosure to all the parties of any significant business relationships with any of the parties before appointment as an arbitrator is final.

"[A]n arbitrator [need not] 'provide the parties with his complete and unexpurgated business biography.' ... But where dealings 'might create an impression of possible bias,' they must be disclosed. Indeed, it seems to us that the better practice is that arbitrators should disclose fully all their relationships with the parties, whether these ties be of a direct or indirect nature. Although some unnecessary disclosure may result, 'if the arbitrators err on the side of disclosure, ... it will not be difficult for courts to identify those undisclosed substantial relationships which are too insubstantial to warrant vacating an award.' Moreover, the role of the judiciary in determining an arbitrator's impartiality after an award has been made will be significantly reduced, since the parties will have the opportunity at the outset of the arbitration to reject an arbitrator or accept him with full knowledge of his connections with the other party."

*Sanko*, 495 F.2d at 1263–64, *supra* note 2, (quoting *Commonwealth Coatings*, 393 U.S. at 149, 151–52, 89 S.Ct. at 339, 340–41 (White, J., concurring)). If an arbitrator fails to make required disclosure "at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship," *Commonwealth Coatings*, 393 U.S. at 151, 89 S.Ct. at 340, a federal court later may vacate the award under § 10 of the Arbitration Act. *See Andros Compania*, 579 F.2d at 699 ("Disclosure by arbitrators should be encouraged; failure to make appropriate disclosure will justify setting aside an award."). Besides giving each of the parties a chance to object when there are genuine fears of possible bias, advance disclosure also prevents a losing party from using purported conflicts as pretexts for invalidating an unfavorable award. *Morelite*, 748 F.2d at 84 n. 5; *Andros Compania* 579 F.2d at 702.

■ However, a failure to disclose material facts does not in itself result in vacatur of an award. *Id.* at 700 ("we have not been quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information"); *Sanford Home*, 665 F.Supp. at 317–319. Rather, when an arbitrator fails to make the required disclosures, a court will later examine the entire record to determine if there are grounds, such as "evident partiality," to vacate the award. *See Andros Compania*, 579 F.2d at 701–02 (denying motion to vacate award because arbitrator only failed to disclose "professional" relationships that did not create even an "impression of possible bias."); *Sanford Home*, 665 F.Supp. at 320–22 (refusing to vacate award on grounds of "evident partiality" despite arbitrator's failure to disclose business ties with one party's law firm). *See also Merit Ins. Co. v. Leatherby Ins. Co.*, 714 F.2d 673, 681 (7th Cir.) (although non-disclosure of past business relationship may have "violated current ethical norms for commercial arbitrators, [it] was at worst a technical violation that does not justify setting aside an award on the statutory ground of evident partiality or corruption"), *cert. denied*, 464 U.S. 1009, 104 S.Ct. 529, 78 L.Ed.2d 711 (1983).

In this case, it is irrelevant whether Proeller was required to disclose his relationship with Sun at the moment either

Arnold or Dour asked him to chair the panel, because Sun actually became aware of the relationship prior to the panel's first hearing. As was its right, Sun objected to his presence, and as was his choice, Proeller refused to step aside.

"[A] prime objective of arbitration law is to achieve a just and expeditious result with a minimum of judicial interference.... this objective can best be achieved by requiring an arbitrator ... to declare any possible disqualification, and then leave it to his or her sound judgment to determine whether to withdraw. The arbitrator must of course be aware that such a decision would be subject to judicial review after the award has been made."

*Marc Rich & Co. v. Transmarine Seaways Corp.*, 443 F.Supp. 386, 387 (S.D.N.Y.1978) (*Marc Rich I*).

The issue in this case is not whether Proeller fully disclosed his relationship with Sun at the proper time. Rather, the issue involves the consequence of Proeller's failure to resign from the panel when Sun entered a prompt and timely objection. Because he refused to do so, each of the arbitrators and Statheros ran the risk that Sun might later challenge the panel's award under § 10 of the Act and that a court might ultimately grant Sun's motion if it agreed that there was "evident partiality." *Morelite*, 748 F.2d at 81–82 & n. 1 (district court refused to disqualify arbitrator before decision was rendered and then refused to vacate award, but Second Circuit reversed on grounds of "evident partiality" because of father-son relationship between arbitrator and officer of union party); *compare Marc Rich I*, 443 F.Supp. at 387–88 (declining to examine possible bias of arbitrator before conclusion of arbitration) *with Transmarine Seaways Corp. v. Marc Rich & Co.*, 480 F.Supp. 352, 358 (S.D.N.Y.1979) (*Marc Rich II*) (after conclusion of arbitration, court found that no one could "reasonably conclude that [arbitrator] was biased"). Because Sun entered a timely objection to Proeller's presence and never waived that objection after he refused to step aside, Sun has properly presented its motion to vacate the award because of "evident partiality."

## IV.

After examining the totality of the circumstances, I find that a reasonable person would have to conclude that Proeller was partial to Statheros in that he was partial against Sun. I therefore vacate the award.

In particular, I find quite disturbing Proeller's and Arnold's decision to allocate arbitration fees unevenly and to increase their own individual fees *without consulting Dour*—the arbitrator selected by Sun. "An arbitrator need not follow all the niceties observed by the federal courts." *Bell Aerospace Co. v. Local 516*, 500 F.2d 921, 923 (2d Cir.1974). However, he must "grant the parties a fundamentally fair hearing." *Id.* Proeller admits intentionally failing to tell Dour that fees would be allocated 60% to Sun and 40% to Statheros, thereby preventing Dour from objecting to this allocation before the final award was rendered. Although unequal fee allocations are legally permissible, *see Konkar Maritime Enter. v. Compagnie Belge D'Affretement*, 668 F.Supp. 267, 274 (S.D.N.Y.1987), this lack of notice is troubling because it prevented Dour from objecting either orally or as part of his written dissent. Dour was not given an opportunity to challenge the reasoning the majority now presents to justify allocating arbitral fees unequally between the parties.

Neither Proeller nor Arnold even attempts to explain or justify the decision to raise their own fees without also raising Dour's, and to do so without notice to Dour. At the least, a reasonable person would have to conclude that this unexplained action, which had an adverse financial impact on both parties—particularly Sun because of the 60/40 allocation—arose from petty vindictiveness directed toward another arbitrator because of his dissent.

Although both Proeller and Arnold appear to be at fault for the majority's action, Proeller's role is the more troubling because he was the member of the panel not appointed directly by either party, as well

as its chairman. In addition, Proeller's presence on the panel was disputed from the beginning. That the objectionable conduct occurred with the participation of another arbitrator—Arnold—selected by Statheros and never opposed by Sun, does not change the calculus. The statute does not require a showing of "evident partiality" in a majority of the arbitral panel, merely "in the arbitrators, *or either* [sic] *of them.*" 9 U.S.C. § 10(b) (emphasis added).

Entirely separate from the issue of whether the award was fair, the circumstances of the separate fee decision ordinarily would invite an evidentiary hearing to consider a possible motion to overturn the award pursuant to § 10(c) of the Arbitration Act, which permits a court to vacate an award when there is "misbehavior by which the rights of any party have been prejudiced." 9 U.S.C. § 10(c). However, it is unnecessary to explore further the circumstances surrounding the fee allocation. The fee may be entirely separate from the damage award, but the circumstances surrounding the fee allocation cast lights and shadows backward on Proeller's extensive involvement with Sun's adversary in another contemporaneous arbitration, and his failure to disclose that involvement from the outset. *See Sanford Home*, 665 F.Supp. at 322 ("When a claim of partiality is made, courts are obliged to scan the record to see if it demonstrates 'evident partiality' on the part of the arbitrator.").

After reviewing the entire record, I am convinced that a reasonable person would have to conclude that Proeller was partial to one party to the arbitration. *See also Pitta v. Hotel Ass'n of New York City, Inc.*, 806 F.2d 419, 423–24 (2d Cir.1986) ("The relationship between a party and the arbitrator may, in some circumstances, create a risk of unfairness so inconsistent with basic principles of justice that the arbitration award must be automatically vacated.").

At all times, including now, Proeller has asserted that he had no ill feelings against Sun and could serve as an impartial arbitrator in Sun's dispute with Statheros. For example at the first arbitration hearing on July 12, 1985 Proeller stated:

> "At one point it was privately suggested to me that because of [the Sun–Fritzen Group] arbitration perhaps I should not take a case in which Sun Oil was involved. I have publicly and privately responded that I could see no reason because I have no ill feelings against Sun, and am quite convinced I can hear any Sun Oil case as impartially as anybody else."

Murphy Affidavit, Exh D, Transcript at p. 11. However, as the late Judge Weinfeld put it: "This self-serving categorical denial of partiality or bias, of course, is neither controlling nor dispositive of the issue; nor is it considered by the court." *Hunt*, 654 F.Supp. at 1500.

Although there may not have been actual bias in the award rendered by the panel, *Morelite* does not require that a challenging party prove actual bias in order to show "evident partiality." Rather, as discussed above, a challenging party must show only that "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." 748 F.2d at 84.

Because Proeller's business relationship with Sun involved an extensive personal involvement in an ongoing arbitration between Sun and the company which employed him as their New York Agent, Proeller should have acceded to Sun's timely request that he step down as an arbitrator. In most cases, a party seeking to vacate an award alleges that the arbitrator's relationship with an opposing party in the arbitration has made that arbitrator partial in favor of that opposing party. This case is somewhat different, because Sun alleges that Proeller's relationship with respect to their own company has made him partial against Sun. Nevertheless, this is a distinction without a difference. Sun had a right to an arbitrator neither evidently partial in favor of the other side nor evidently partial against Sun.

Based on the nature of his business relationship with Sun, and his behavior in con-

nection with the fee, a reasonable person would have to conclude that Proeller was partial to Statheros, or at least against Sun, in the Sun–Statheros arbitration. *Morelite*, 748 F.2d at 83. Proeller was President of the New York agent for Fritzen Group and was personally and extensively involved in the arbitration between Sun and Fritzen Group—as demonstrated by the letter he wrote to Sun with respect to Fritzen Group's damage claim. Although Proeller may not have had a direct financial interest in either the arbitration or the underlying contract between Sun and Fritzen Group, at the least his status as Fritzen Group's New York agent could only be enhanced to the extent Fritzen Group succeeded in its arbitration against Sun. Sun was not unreasonable in fearing that either the conduct or ultimate outcome, or both, of the arbitration between Sun and Fritzen Group might color Proeller's judgment in the separate arbitration between Sun and Statheros.

Proeller's extensive involvement in the Sun–Fritzen Group arbitration both as a witness and as a representative of Sun's adversary in the arbitration itself distinguishes this case from *Marc Rich II*, 480 F.Supp. at 352. In *Marc Rich II*, Judge Haight denied Marc Rich & Co's motion to vacate an award rendered by a panel in which one of the arbitrators was President of a company that happened to be the operating manager and general agent for a corporation involved in a separate arbitration. Coincidentally, that separate arbitration had been the subject of the earlier case of *Andros Compania Maritima, S.A. v. Marc Rich & Co.*, 579 F.2d 691 (2d Cir. 1978). In *Marc Rich II*, the court made it quite clear that the challenged arbitrator was being accused of no more than an "appearance of bias" because of the fact that his "company represented another company which in turn asserted [an unrelated] ... claim against Rich." 480 F.Supp. at 358. There is no indication that the challenged arbitrator in that case was involved in the other arbitration to the same degree as Proeller was involved in the Sun–Fritzen Group arbitration. In fact, the *Andros Compania* court de-

scribed the challenged arbitrator's role in that separate proceeding as "attenuated." 579 F.2d at 701.

By contrast, Proeller was not just president of Fritzen Group's agent; he was intimately involved in the separate arbitration both as witness and as representative of Sun's adversary. He negotiated and signed the contract which was the subject of the separate arbitration, testified as a witness on behalf of Sun's adversary, and represented that adversary in the separate arbitration.

I also find it significant that Sun's challenge arises from Proeller's adversarial business relationship with the company and not from a professional relationship of the type that are common in the maritime field—a distinction which the *Andros Compania* Court found significant in denying a motion to vacate. *Andros Compania*, 579 F.2d at 701 (challenged arbitrator had sat on other panels with individual employed by a party). Here, Proeller was intimately involved in a business dispute between the company he represented and Sun. Additionally, the time period in which Proeller served as arbitrator overlapped his involvement in the separate Sun–Fritzen Group proceeding. That proceeding lasted from March 1982 until October 1987 while the Sun–Statheros arbitration lasted from July 1985 until September 1985. Significantly, Proeller submitted a damage claim on behalf of Fritzen Group only two months after agreeing to act as arbitrator for the Sun–Statheros panel and only four months before the first hearing of that panel. Thus, the timing of the two arbitrations adds to the weight of other circumstances which suggest "evident bias." *See Sofia*, 628 F.Supp. at 116; *Sanford Home*, 665 F.Supp. at 322.

The cases cited by Statheros all involve relationships far more remote, and suspicions far more speculative, than those giving rise to the "evident partiality" claim in this case. *See Globe Transport & Trading, Ltd. v. Guthrie Latex, Inc.*, 722 F.Supp. 40, 47–48 (S.D.N.Y.1989) (refusing to vacate award where a lawyer for one of the party's became associated in the middle

of the arbitration with a law firm formerly associated with one of the arbitrators); *Sofia Shipping*, 628 F.Supp. at 119 (refusing to vacate award where challenged arbitrator and an individual who was an employee and witness for one party was also an arbitrator in his own right on several panels hearing disputes involving challenged arbitrator's employer); *Sidarma Societa Italiana v. Holt Marine Industries*, 515 F.Supp. 1302, 1307 (S.D.N.Y.) (refusing to vacate award based on losing party's "speculation" that arbitration decision had been motivated by a desire of arbitrators to avoid a precedent that might adversely affect their own firms), *aff'd mem.*, 681 F.2d 802 (2d Cir.1981).

This is not a "classic example of a losing party seizing upon 'a pretext for invalidating the [arbitration] award.'" *Andros Compania*, 579 F.2d at 702 (quoting *Commonwealth Coatings*, 393 U.S. at 151, 89 S.Ct. at 340 (White, J., concurring)) (brackets in original). Sun objected to Proeller's presence almost as soon as the company became aware of his selection to the panel and before the arbitration began. It reiterated its objection at the first hearing and went so far as to seek a judicial determination of the matter, albeit prematurely.[4]

I do not have to find that Proeller was actually biased against Sun, nor do I. However, the fee episode rings like the 13th chime on the mantel clock: Not only is it utterly unreasonable in its own right, but it also generates substantial doubts about the validity of what preceded it. When what preceded it is scrutinized closely, and in conjunction with the fee episode, the result is "such that reasonable people would have to believe that it provides strong evidence of partiality by the arbitrator." *See Morelite*, 748 F.2d at 85. Accordingly, the arbitration award is vacated.

SO ORDERED.