937 P.2d 715

James WAGES and Carol Wages, husband and wife, Plaintiffs–Appellants, Cross Appellees,

v.

SMITH BARNEY HARRIS UPHAM & CO., a foreign corporation doing business in Arizona, Defendant–Appellee, Cross Appellant.

No. 1 CA–CV 96–0091.

Court of Appeals of Arizona, Division 1, Department C.

May 1, 1997.

Broadman & Hartmann by Ira S. Broadman and Robert J. Hartmann, Phoenix, for Plaintiffs–Appellants Cross Appellees.

Lewis & Roca, LLP by Patricia K. Norris and Jeff Shumway, Phoenix, Smith Barney Inc., Office of the General Counsel by David S. Friedman, New York City, for Defendant–Appellee, Cross Appellant.

## OPINION

THOMPSON, Presiding Judge.

James and Carol Wages (collectively Wages) sought confirmation of an arbitration award. The trial court denied confirmation, deciding that there was "evident partiality" in the proceedings and that the arbitrators abused their discretion in barring Smith Barney Harris Upham & Co. (Smith Barney) from presenting evidence in support of its defense. For the following reasons, we affirm.

### FACTS AND PROCEDURAL HISTORY

The facts are not in dispute. In 1972, James Wages was rendered quadriplegic in a construction accident. · He received a net settlement of $888,000 on his personal injury claim. With the advice of a financial advisor, he invested most of it in bond mutual funds and annuity funds. Unable to work, Wages depended on the income from the investments to pay living expenses.

In June 1986, Wages met Dennis Melton, a Smith Barney employee. Acting on Melton's recommendations, Wages liquidated their previous investments and authorized Smith Barney to invest $250,000 in American Mutual Fund (AMF) and $150,000 in a limited partnership that owned and operated a Westin Hotel in San Francisco, California. They subsequently invested approximately $100,000 in other securities recommended by Melton and his successor at Smith Barney, Thomas Jeffrey. In 1988, they quit dealing with Smith Barney.

In October 1992, four years after moving their account from Smith Barney, Wages submitted a claim to the National Association of Securities Dealers (NASD), asserting that Smith Barney had improperly induced them to invest in high risk ventures that resulted in significant losses.[1] The next month, the

---

1. Wages's contract with Smith Barney contained the following provision:

    11. The undersigned agrees that all controversies between the undersigned and Smith Barney and/or any of its officers, directors or employees concerning or arising from (i) any account maintained with Smith Barney by the undersigned; (ii) any transaction involving Smith Barney and the undersigned, whether or not such transaction occurred in such account

NASD found the claim deficient, stating that the claim was ineligible for arbitration under § 15 of the NASD Code of Arbitration Procedure (the NASD Code) because it arose more than six years before arbitration was sought.

On July 15, 1993, Wages filed suit in superior court making the same or similar allegations as had their arbitration claim. They did not reveal the NASD's rejection of their prior claim. Smith Barney moved to compel arbitration. The court granted Smith Barney's motion and referred the matter to NASD arbitration.

Three months later, Wages filed the claim at issue here with the NASD. The claim alleged that investments urged by Smith Barney were unsuitable and unreasonably risky. They also claimed that Melton and Jeffrey had misrepresented the safety of the investments and had overstated the income they would generate.

Smith Barney was served on March 25, 1994. On May 3, 1994 it received an extension of time to respond until May 13, 1994. Smith Barney, then known as Smith Barney Shearson, confirmed the extension by letter to Wages's attorney, and sent a copy to the NASD. On May 13, Wages gave Smith Barney an additional extension of one business day to Monday, May 16, 1994. This extension was also memorialized in a letter to counsel and copied to the NASD.

On May 17, Smith Barney's counsel requested an additional extension of time to May 24, explaining that he was having difficulty obtaining information concerning the Wages investments. The letter to opposing counsel stated that "[i]f you are not in posi-

tion to grant this extension, please take this letter as a general denial to which an amendment will be forth coming." The letter does not indicate whether it was copied to the NASD.

On May 4 and May 23, 1994 Wages served Smith Barney with requests to produce documents pursuant to § 32(b)(1) of the NASD Code. No documents were produced. On June 28, the request for production of documents was repeated. Again, Smith Barney produced no documents. On October 14, 1994 Wages made a final request for production of the documents they initially sought in May. Smith Barney never produced any documents.

On November 9, 1994, approximately five months prior to the arbitration hearing, Smith Barney filed an "amended answer" to the claim.[2] The amended answer denied liability and asserted nine affirmative defenses, including untimeliness.

The October 14, 1994 letter complained only of the lack of a discovery response by Smith Barney. It did not complain of inadequacies in the answer (that is, the general denial), nor that Smith Barney's failure to file a more complete answer was hindering the claimants' preparations for the arbitration hearing. Wages did not request a pre-hearing conference to compel the production of documents as provided for under § 32(b)(4) of the NASD Code.

On November 19, the NASD notified Smith Barney that it had begun the process of choosing an arbitration panel. Both sides exercised peremptory challenges against proposed arbitrators.[3] The NASD then appoint-

---

or accounts; or (iii) the construction, performance or breach of this or any other agreement between us, whether such controversy arose prior, on, or subsequent to the date hereof, shall be determined by arbitration before the National Association of Securities Dealers, Inc., the New York Stock Exchange, the American Stock Exchange, or any recognized arbitration facility provided by any exchange and in accordance with the rules of such body then obtaining. The undersigned may elect which arbitration forum shall hear the matter by sending a registered letter or telegram addressed to Smith Barney at 1345 Avenue of the Americas, New York, N.Y. 10105, Attn: Law Department.... The undersigned and Smith

Barney agree that the award of the arbitrators, or the majority of them, shall be final and judgment upon the award rendered may be entered in any court having jurisdiction.

2. Section 39(b) of the NASD Code provides:

After a panel has been appointed, no new or different pleading may be filed except for a responsive pleading as provided for in (a) above or with the panel's consent.

3. Under § 22 of the NASD Code, each side, regardless of the number of claimants or respondents, has the right to exercise one peremptory challenge.

ed Phoenix attorney Brian Warnock to the panel. Warnock became its chairman.

On December 9, Wages moved to bar Smith Barney from presenting evidence, arguments, or defenses at the hearing. They based the motion on Smith Barney's allegedly late and inadequate answer, and on Smith Barney's failure to respond to their document requests. They asserted that these failings prejudiced their ability to prosecute their claim.

Smith Barney's response asserted that because the claims were so old, it was difficult to locate relevant documents and witnesses. Smith Barney moved to dismiss the claims as untimely under § 15 of the NASD Code.

The arbitration panel granted Wages's motion on January 12, 1995, barring Smith Barney from "presenting any matter, arguments or defenses at the hearing in this proceeding." The order was expressly based on § 25(b)(2)(iii) of the NASD Code, which provides:

> A respondent ... who fails to file an Answer within twenty (20) business days from receipt of service of a Claim, unless the time to answer has been extended pursuant to paragraph (5),[4] below, may, in the discretion of the arbitrators, be barred from presenting any matter, arguments, or defenses at the hearing.

Smith Barney made a motion for reconsideration which was denied by the arbitrators.

The panel's order precluded Smith Barney from presenting any evidence on damages and liability. The panel subsequently interpreted the order to allow Smith Barney to cross-examine witnesses and present argument on matters regarding which Wages had the burden of proof.

When Warnock was appointed to the panel, the NASD provided the parties with his Arbitrator Disclosure Statement. Section 23 of the NASD Code requires each arbitrator to "disclose to the Director of Arbitration any circumstances which might preclude such arbitrator from rendering an objective and impartial determination." Pursuant to § 23(a)(2), such required disclosure includes "existing or past financial, business, professional, family, or social relationships that are likely to affect impartiality or might reasonably create an appearance of partiality or bias." Warnock's disclosure statement revealed that he had served as an arbitrator in four securities arbitrations, served as a securities mediator five times, and served as counsel in three securities arbitrations.

On March 21, 1995, six days before the hearing, Smith Barney moved the Director of Arbitration to remove Warnock from the panel for cause, asserting he had failed to disclose facts revealing possible bias. Smith Barney also requested replacement of the other arbitrators, asserting that Warnock's nondisclosure had compromised the apparent fairness of the entire panel. The Director denied the request. Smith Barney was then allowed to present the motion to the arbitration panel as a request for recusal. The arbitrators denied the request on the first day of the hearing.

Smith Barney based its motion on the following matters, which had not been disclosed by Warnock:

1. Two of the three securities arbitration cases handled by Warnock as counsel involved the retail brokerage business of Shearson Lehman Brothers, Inc. (Shearson).[5]

2. One of the claims Warnock filed against Shearson was very similar to the instant case. Warnock represented Webb, a claimant who was handicapped and unable to work. Warnock had argued that income from Webb's investments was necessary for his livelihood and that he was promised his investments were safe and would provide

---

4. The reference to paragraph "(5)" is to § 25(b)(5), which provides:
   The time period to file any pleading, whether such be denominated as a[n] ... Answer ... may be extended for such further period as may be granted by the Director of Arbitration.

5. In July 1993, Smith Barney acquired Shearson's retail brokerage division. Smith Barney purchased all of Shearson's retail brokerage assets; the company became the second largest retail brokerage house in the nation; Smith Barney also purchased the Shearson name. Shearson's retail operations were more than three times as large as those of Smith Barney. The company became known as "Smith Barney Shearson."

sufficient income to live on. Warnock also asserted that the promises of safety were false and the investments were unsuitable.

3. Smith Barney asserted that Warnock harbored strong opinions about how a securities firm should handle a disabled investor's funds. Warnock had criticized the handling of Webb's accounts in a demand letter to Shearson, stating:

> [Webb's] impairment and lack of sophistication were such that it was totally unrealistic for either Moyer or the brokerage firm to look to him for meaningful confirmation of any investment decisions....
>
> ....
>
> This account clearly reflects a violation of almost every basic industry and common law obligation. I am of the opinion that both the broker and the firm are responsible for [Webb's] devastating losses....

Warnock also criticized Shearson for its insensitivity and lack of responsiveness:

> A meeting with Mr. Kirkman, the branch manager, and subsequent written inquiries have failed to produce ANY information or assistance, save a demand for $300 to obtain copies of the account and caustic letter to Mr. Webb.... Communication with the branch clearly shows a lack of sensitivity to Mr. Webb's position.
>
> At one point in the Webb proceedings, Warnock characterized Shearson's conduct as "reprehensible."

4. In another case, Warnock accused Shearson of misrepresentation and failing to live up to its promises.

Both the NASD and the panel refused to remove Warnock and he refused to step down. After a three-day hearing, the arbitration panel issued its award. It awarded Wages $950,000 in compensatory damages, plus costs and fees.

On April 28, 1995, Wages filed an application to confirm the award in superior court. Smith Barney opposed the application and moved to vacate the award, asserting that the arbitration had not been fair because of the "evident partiality" of Warnock and because it had been deprived of a fair opportunity to present its case. Smith Barney also argued that the arbitrators exceeded their authority by failing to dismiss Wages's claim under § 15 of the NASD Code.

The trial court vacated the award, finding that Warnock's "evident partiality" and the preclusion order deprived Smith Barney of a fair hearing. The court remanded for a new arbitration proceeding. Wages timely appealed and Smith Barney filed a notice of cross-appeal. We have jurisdiction pursuant to Ariz.Rev.Stat. Ann. (A.R.S.) § 12–2101.01(A)(3).

## DISCUSSION

### I. WHO DETERMINES ARBITRABILITY

■ Smith Barney has filed a cross-appeal. It challenges the trial court's tacit rejection of its argument that Wages's claim was untimely under the NASD Code, and that the arbitrators exceeded their authority in considering the claim. One of the bases for vacating a claim is that the arbitrators exceeded their authority. 9 U.S.C. § 10(a)(4); A.R.S. § 12–1512(A)(3). The issue centers around § 15 of the NASD Code, which provides:

> No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim, or controversy. This section shall not extend applicable statutes of limitations, nor shall it apply to any case which is directed to arbitration by a court of competent jurisdiction.

Smith Barney moved the arbitrators to dismiss the arbitration pursuant to this section. The arbitrators denied the motion without comment. Smith Barney then raised the issue in opposing the application to confirm the arbitration award, arguing that the court should rule that the claim was untimely filed. The court vacated the arbitration award, but not on this basis.

A threshold issue is whether the court or the arbitrator may decide whether a dispute is arbitrable. According to the Supreme Court, who decides arbitrability is like any other contract interpretation question: it de-

pends on what the parties agreed to. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) ("arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration"). This is generally a state-law question. *Id.* The Court imposed an "important qualification" on that general rule, however:

> Courts should not assume that the parties agreed to arbitrate arbitrability unless there is "clea[r] and unmistakabl[e]" evidence that they did so. In this manner the law treats silence or ambiguity about the question *"who* (primarily) should decide arbitrability"* differently from the way it treats silence or ambiguity about the question *"whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement"—for in respect to this latter question the law reverses the presumption.

*Id.* (citations omitted) (emphasis added).[6]

Smith Barney argues that *Foy v. Thorp,* 186 Ariz. 151, 920 P.2d 31 (App.1996), supports the position that the question of timeliness of an arbitration demand is a matter for the court. We do not reach this threshold issue, however, because Smith Barney has waived it.

Smith Barney compelled arbitration here and obtained dismissal of Wages's civil action by asserting that this dispute was arbitrable. A party may not compel submission of an issue to arbitration, and then challenge the authority of the arbitrators to act on that very issue when an unfavorable decision results. *Ficek v. Southern Pac. Co.,* 338 F.2d 655, 657 (9th Cir.1964), *cert. denied,* 380 U.S. 988, 85 S.Ct. 1362, 14 L.Ed.2d 280 (1965). Because this is what Smith Barney seeks here, we reject Smith Barney's challenge to the arbitrators' authority. Having

invoked the authority, Smith Barney must abide by it.

## II. EVIDENT PARTIALITY

Courts have an obligation to maintain the integrity of their own role in the arbitration process. Accordingly, pursuant to 9 U.S.C. § 10(a)(2), the court may vacate the arbitration award "[w]here there was evident partiality or corruption in the arbitrators...." Similarly, A.R.S. § 12–1512(A)(2) provides that "the court shall decline to confirm an award and enter judgment thereon where ... [t]here was evident partiality by an arbitrator appointed as a neutral or corruption in any of the arbitrators or misconduct prejudicing the rights of any party." A party challenging an arbitration award has the burden of proving the existence of grounds to vacate the award. *Woods v. Saturn Distribution Corp.,* 78 F.3d 424, 427 (9th Cir.1996), *cert. dismissed,* —— U.S. ——, 117 S.Ct. 30, 135 L.Ed.2d 1123 (1996); *Sheet Metal Workers Int'l Ass'n Local Union # 420 v. Kinney Air Conditioning Co.,* 756 F.2d 742, 745 (9th Cir.1985).

Neither 9 U.S.C. § 10(a)(2) nor A.R.S. § 12–1512(A)(2) defines "evident partiality." In *Commonwealth Coatings Corp. v. Continental Casualty Co.,* 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), the Supreme Court, considering 9 U.S.C. § 10, stated:

> [The provisions of § 10] show a desire of Congress to provide not merely for *any* arbitration but for an impartial one.
>
> . . . .
>
> We can perceive no way in which the effectiveness of the arbitration process will be hampered by the simple requirement that arbitrators disclose to the parties any dealings that might create an *impression of possible bias.*
>
> . . . .
>
> [A]ny tribunal permitted by law to try cases and controversies not only must be unbiased but also must avoid even the

---

6. The Court explained:

> [G]iven the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on the "who should decide arbitrability" point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.

*First Options,* 514 U.S. at 946, 115 S.Ct. at 1925.

appearance of bias. We cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might *reasonably be thought biased against one litigant and favorable to another.*

393 U.S. at 147, 149–50, 89 S.Ct. at 338, 340 (emphasis added).

In *Morelite Constr. Corp. v. New York City Dist. Council Carpenters Benefit Funds,* 748 F.2d 79 (1984), the Second Circuit Court of Appeals found that 9 U.S.C. § 10 requires a showing of something more than the mere appearance of bias but less than proof of actual bias. The court held that "evident partiality" under § 10 will be found "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Id.* at 84.

The various federal and state courts that have addressed "evident partiality" have struggled with the concept. *See, e.g., Morelite,* 748 F.2d at 82 (recognizing that what constitutes "evident partiality" by an arbitrator is a troublesome question); *International Bhd. of Elec. Workers, Local Union No. 323 v. Coral Elec. Corp.,* 104 F.R.D. 88, 89 (S.D.Fla.1985) (" 'Evident partiality', like obscenity, is an elusive concept: one knows it when one sees it. . . . No jurist has yet coined an exacting legal standard for 'evident partiality', although many have tried."); *Schreifels v. Safeco Ins. Co.,* 45 Wash.App. 442, 725 P.2d 1022, 1024 (1986) (quoting *International Bhd. of Elec. Workers* ). What *is* clear is that in determining whether "evident partiality" exists, courts take a case-by-case approach. *Sun Ref. & Mktg. Co. v. Statheros Shipping Corp. of Monrovia, Liberia,* 761 F.Supp. 293, 298 (S.D.N.Y.1991), *aff'd,* 948

F.2d 1277 (2d Cir.1991) (citing *Andros Compania Maritima, S.A. v. Marc Rich & Co.,* 579 F.2d 691, 700 (2d Cir.1978); *see also Lifecare Int'l, Inc. v. CD Medical, Inc.,* 68 F.3d 429, 435 (11th Cir.1995), *modified,* 85 F.3d 519 (11th Cir.1996)) ("This is one area of the law which is highly dependent on the unique factual settings of each particular case.").

■ Wages argue that this was not a nondisclosure case, and therefore, the standard for evident partiality enunciated in *Commonwealth Coatings* does not apply—the proper standard is an actual bias standard. They further argue that even if *Commonwealth Coatings* applies, the connection between Warnock and Smith Barney is so attenuated it does not constitute the type of relationship contemplated by the Supreme Court. However, this *is* a nondisclosure case.[7] Warnock failed to reveal he had sued Smith Barney's predecessor, Shearson, in two separate instances on behalf of investors, one with virtually identical claims to those asserted by Wages and also involving a disabled investor. Any reasonable participant in the arbitration process would expect an arbitrator to disclose such information, pursuant to § 23 of the NASD Code, as indicative of "circumstances which *might* preclude such arbitrator from rendering an objective and impartial determination," and of "past financial, business, or professional . . . relationships that are likely to affect impartiality or *might reasonably create an appearance of partiality or bias.*" (Emphasis added.) Wages contend however that, because Smith Barney discovered these facts on its own ten days prior to the hearing, there is no issue of nondisclosure. But the panel, including Warnock, had already made the crucial ruling that took away Smith Barney's defense

---

7. Nondisclosure is significant because the concealment of pertinent information by an arbitrator interferes with the parties' ability to choose their arbitrators intelligently, and justifies vacating an award entered by an evidently partial arbitral body. *See Commonwealth Coatings,* 393 U.S. at 151, 89 S.Ct. at 340 (White, J., concurring) ("it is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or accept him with knowledge of the relationship. . . ."). Indeed, in many of the reported decisions, it is the nondisclosure

claim which "fueled the claim of bias." *Toyota of Berkeley v. Automobile Salesmen's Union, Local 1095,* 834 F.2d 751, 756 (9th Cir.1987), *cert. denied,* 486 U.S. 1043, 108 S.Ct. 2036, 100 L.Ed.2d 620 (1988). In this case, ·Warnock's nondisclosure of his involvement in previous claims against Shearson deprived Smith Barney of the opportunity to timely object on grounds of bias to Warnock's consideration of Wages's motion to preclude Smith Barney's defenses. Warnock's nondisclosure of pertinent facts surely "fueled the claim of bias" here.

months prior to the hearing date and prior to Smith Barney's discovery. It is also telling that in opposing Smith Barney's motion to remove Warnock, Wages argued it would be unfair to change the panel on the eve of the hearing. Thus, the fact that Warnock's nondisclosure had been effectual until the eve of the arbitration proceeding was used by Wages to influence the panel when it was asked to remove Warnock. That Smith Barney learned of the undisclosed matters before the hearing did not remedy the problem created by the nondisclosure.

We also disagree with the assertion that the proceedings were not tainted by evident partiality. After examining the totality of the circumstances in this case, including the panel's extreme preclusion order, we find that a reasonable person could indeed conclude that Warnock was partial to Wages in that he was biased *against* Smith Barney. *See Sun Refining*, 761 F.Supp. at 302 (no distinction between *partiality to* and *partiality against*; company involved in arbitration has a right to an arbitrator neither evidently partial in favor of the other side nor evidently partial against the company).

This case bears marked similarities to *Sun Refining*. In that case the district court, relying on *Morelite*, found that an arbitrator who became involved as a witness in a separate arbitration between his employer and one of the parties in the case he was arbitrating (Sun Refining) was evidently partial as an arbitrator. 761 F.Supp. at 295. Several months prior to the hearing, Sun Refining, the party objecting to confirmation of the award, became aware of the arbitrator's involvement in the second case, and requested the arbitrator to recuse himself. *Id.* at 296. The arbitrator refused to do so, maintaining he could be fair and impartial. *Id.* Without finding actual bias, after examining the totality of the circumstances in the case, the district court found that a reasonable person would conclude the arbitrator was partial against Sun Refining. *Id.* at 299, 301. The court was particularly disturbed by a decision made by two-thirds of the panel (including the arbitrator in question) to allocate arbitration fees unevenly to Sun Refining's detriment. *Id.* at 301.

Similarly, we are disturbed by the panel's order in this case completely barring Smith Barney from presenting any evidence whatsoever, including evidence of damages, at the hearing. Because Wages neither challenged the adequacy of the answer until shortly before the hearing nor took any formal steps to obtain additional documents, an order that essentially barred any defense is so extreme that we find it difficult to explain unless partiality played a role. Warnock served as chairperson of the three-member panel, and was the only attorney on that panel. Combined with Warnock's nondisclosures as noted above, we are left with an impression of partiality.

Further, as *Sun Refining* illustrates, while Smith Barney's discovery of the details of Warnock's arbitration history came too late to save it from the disastrous bar order, Wages's arguments here are not advanced by noting the fact that the discovery came before the arbitration hearing and after the exercise of peremptory challenges. As to the effect of Warnock's evident bias on the conduct of the arbitration hearing, the issue is not the timing of the ultimate disclosure, but the consequence of Warnock's continued presence on the panel after Smith Barney had become enlightened as to Warnock's history and his nondisclosure, and objected to him serving as an arbitrator. Because Warnock remained after the objection, "each of the arbitrators and [Wages] ran the risk that [Smith Barney] might later challenge the panel's award ... and that a court might ultimately [undo the award for evident partiality]." *Id.* That latent risk has now come to fruition.

In other words, Warnock's *nondisclosure* unfairly harmed Smith Barney because, being ignorant of Warnock's prior representation of other claimants against Shearson in cases so similar to this, Smith Barney could not challenge his presence on the panel as it decided to emasculate the defense. Warnock's *presence* on the panel after his evident partiality became known and objected to by Smith Barney essentially made the proceedings voidable at the ultimate election of Smith Barney.

Wages look to *Schmitz v. Zilveti*, 20 F.3d 1043 (9th Cir.1994), in support of their argument that the "evident partiality" standard should not apply in this case. *Schmitz* clearly does not support this reading; here, Smith Barney was palpably injured by Warnock's nondisclosure. *Schmitz* provides, however, a succinct paraphrase of "evident partiality," as a "reasonable impression of partiality." 20 F.3d at 1047. According to *Schmitz*, then, the impression of partiality with which our careful review of the circumstances of this case has left us is "evident partiality." We are also buttressed in our conclusion here by *Rogers v. Schering Corp.*, 165 F.Supp. 295 (1958), *aff'd*, 271 F.2d 266 (3d Cir.1959), which smartly rejects the notion that a party who has exercised all available peremptory strikes is not entitled to know of an arbitrator's evident partiality, and holds that such nondisclosure requires vacating an arbitration award. *Id.* at 302.

We conclude that the trial court did not err in setting aside the award on the basis of evident partiality.

## III. UNFAIR HEARING

Because we affirm the trial court's finding of evident partiality, we do not consider whether the panel abused its discretion in barring Smith Barney from presenting evidence in support of its defense.

## CONCLUSION

Because Warnock, a "neutral" arbitrator, failed to disclose highly pertinent facts and participated in a troublesome ruling imposing a draconian sanction, thereby creating a reasonable impression of partiality, we hold that the trial court properly vacated the arbitration award. In addition, we conclude that Smith Barney, by compelling arbitration and thereby avoiding litigation, waived the claim that the arbitrators exceeded their authority in determining that Wages's claim was arbitrable in the first instance. Accordingly, the judgment is affirmed.

McGREGOR, C.J., and
KLEINSCHMIDT, J., concur.