[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON APPLICATION TO VACATE ARBITRATION AWARD
The Hartford Police Union ("Union") has applied to this Court under General Statutes § 52-418[1] to vacate a September 15, 1993 Arbitration Award ("Award") in which a three-person panel from the State Board of Mediation and Arbitration ("SBMA") rejected its grievance challenging the refusal of the City of Hartford ("City") to grant pay raises amounting to one full growth step to eleven members of the Union who were promoted from sergeant to lieutenant in December of 1990. In support of its application, the Union advances two grounds.
First, it contends that the arbitrators "exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made." Conn. Gen. Stat. § 52-418(4). It bases this argument on the arbitrators' sua sponte attempt, nearly six months after the parties to the arbitration had concluded their evidentiary presentations and filed their final briefs on the questions presented for decision, to reopen the arbitration to hear new evidence from a witness for the City. Second, it contends that both during and immediately following the hearing at which the additional witness was to have testified, the Chairperson of the arbitration panel so conducted herself as to exhibit "evident partiality" against the Union and in favor of the City. Conn. Gen. Stat. § 52-418(2). In CT Page 4434 particular, the Union claims that the Chairperson violated the statutory standard for arbitrator neutrality by treating the Union lawyer with extreme discourtesy and by showing undue solicitude toward the City's lawyer and her witness.
For the following reasons, the Court denies the Union's application.
FACTUAL AND PROCEDURAL BACKGROUND
On or about December 23, 1990, eleven experienced Hartford Police sergeants, each a four-year college graduate with more than two years' experience at the rank of sergeant, were promoted to the rank of lieutenant. Prior to their promotions, the new lieutenants had been paid at the rate of $846.25 per week, calculated as follows: $807.50 per week in basic salary, set at the maximum weekly pay rate for sergeants under the terms of the Union's Collective Bargaining Agreement with the City; and $38.75 as a college incentive increment, figured at 5% of the basic weekly pay rate for new sergeants under the terms of the Agreement. The former sergeants had become eligible to be paid at the maximum rate for sergeants by working as sergeants for one full year. They had become eligible to receive college incentive increments by having or earning their four-year college degrees and working one full year at the maximum rate for sergeants.
When the former sergeants were promoted to lieutenant, they became eligible, under the terms of the Agreement, to be paid at the higher basic rate for lieutenants of $852.75 per week. According to the City, however, they thereby lost their eligibility for college incentive increments because, under a strict construction of the Agreement, they had not yet worked at the maximum rate for lieutenants, much less worked at that rate for one full year. Therefore, under the City's interpretation of the Agreement, the total pay raise to which each of the new lieutenants became entitled upon receiving his promotion was only $6.25 per week.
In its grievance the Union contended that the City's reading of the Agreement was in error because it gave no effect to the City's own Personnel Rules and Regulations. Under those Rules, which were specifically recognized under Section 3.3 of the Agreement to the extent they were not superseded thereby, any employee promoted to a new position CT Page 4435 was entitled to be paid at a new rate which was one full growth step higher than the rate at which he was paid in his old position. Claiming that nothing in the Agreement superseded the one-full-growth-step pay-raise provision of the Personnel Rules, the Union insisted that under that provision, the City should be required to pay the new lieutenants at a higher rate.
The arbitration of the Union's grievance was assigned to a panel of three SBMA arbitrators: management member Robert Canning; labor member John Colangelo, and a neutral arbitrator, Linda Johnson, who chaired the panel. The panel received evidence on the parties' respective positions on July 27, 1992, then received briefs from the parties as follows: opening briefs from the Union and the City on September 15, 1992; and a reply brief from the Union on September 29, 1992.
In its opening brief, at pages 7-9, the Union took special note of a memorandum which had been put in evidence at the July 27, 1992 hearing. In the memorandum, written by Hartford Chief of Police Ronald Loranger to City Director of Personnel Patricia Washington, Chief Loranger had specifically recommended that upon their promotion from sergeant to lieutenant, new lieutenants should be brought at once to the maximum pay rate for their new rank so that any inequities between their salaries and those of personnel at lower ranks could be avoided. Union counsel took special note of the fact that this memorandum, as it was introduced in evidence at the hearing, was marked "approve" by Personnel Director Washington, who then initialled it. Noting further that the City had failed to call Ms. Washington as a witness at the hearing to contradict or explain away her handwritten notations on the Loranger memorandum, the Union asked the arbitrators to draw an inference against the City that its own Police Chief and Personnel Director were aware that failure to raise the promoted employees to the maximum rate would result in a violation of the Personnel Rules[.]" Union's Opening Memorandum, p. 9. As authority for this proposition, the Union relied on the missing witness doctrine of Secondinov. New Haven Gas Co., 147 Conn. 672 (1960).
Several months later, in mid-January of 1993, the arbitrators notified the parties that a "second arbitration hearing" would be held on March 2, 1993. When counsel for the Union inquired as to the purpose for the second hearing, he CT Page 4436 was told that the panel members wished to hear testimony from Personnel Director Patricia Washington.
Upon learning of this purpose, Union counsel prepared a memorandum of law in opposition to the reopening of the arbitration, which he brought with him to the hearing on March 2, 1993. In attendance at the hearing in addition to the arbitrators and Union counsel were counsel for the City, Personnel Director Washington, and a professional stenographer whom the Union had hired to make a verbatim record of the proceedings.
As the hearing began, Chairperson Johnson first took note of the presence of the stenographer, stating that the panel had not ordered one. When Union counsel acknowledged that it was he who had hired the stenographer, he was invited by Chairperson Johnson to speak.
Initially, counsel recounted the history of the arbitration to date, taking note of the July 27, 1992 evidentiary hearing, the September 1992 brief-filing deadlines, and the panel's January 25, 1993 notice of its intention to reopen the arbitration. Then, with specific reference to the witness whom the panel intended to recall, counsel voiced an objection to reopening the hearing on two grounds: first, that the panel had no right to reopen the hearing under Section 31-91-42 of the Connecticut State Regulations because the reopening had not been sought by either party to the arbitration; and second, that the City had no right to have Ms. Washington's testimony presented, since it had failed to call her at the July 27, 1992 hearing, and was therefore subject to the drawing of an unfavorable inference under Secondino v. New Haven Gas Company, supra.
Chairperson Johnson promptly reminded counsel that the Union was the "moving party" in the arbitration, noting that, "[i]f the Union is satisfied that the Panel has adequate evidence, even though the Panel feels it needs additional evidence, and they're willing to let their case either rise or fall on the evidence, we will take that into consideration." When counsel responded that that was indeed the Union's "position," the Chairperson informed him that the panel was "going to go out and caucus," then admonished him as follows:
We are all surprised, I must say that; CT Page 4437 and I do think that there is another element that clearly, as a courtesy to the opposing party as well as members of this board, this eleventh hour or twelfth hour grandstand play is unbecoming a gentleman. I think you certainly had an obligation, at the barest minimum, since this has been scheduled for well over a month, of notifying the City and notifying the Panel of you position.
Transcript of 3/2/93 Hearing, pp. 4-5. The following colloquy ensued:
 MR. McGRAIL: Well, first of all, I would take offense at it being characterized as a "grandstand play," number one.
 CHAIRPERSON JOHNSON: I mean, coming in with a Stenographer and briefs and presenting an argument without even giving any indication to anyone that you had an objection? Okay, then I remove my characterization. Let's say it is a surprise.
 MR. McGRAIL: If I may just state for the record precisely what has occurred here. We received notice of this hearing from the Board in January of this year. We have other grievances —
 CHAIRPERSON JOHNSON: We are talking about March now.
 MR. McGRAIL: I understand that. We have other grievances that are pending before this Commission, either grievances that concern questions of lieutenant's pay, lieutenant status in the department. Frankly, we do not know what the specific issue was that was going to be raised here until we called last week and ascertained what it was. And now, frankly, obviously that period of time's elapsed — CT Page 4438
 CHAIRPERSON JOHNSON: And a week ago, so then you admit that a week ago you knew what the issue —
MR. McGRAIL: I said last week.
 CHAIRPERSON JOHNSON: A week — well, last week is a week ago.
 MR. McGRAIL: Last week was Thursday or Friday. I'm not sure when I found that out. At that point in time —
CHAIRPERSON JOHNSON: Prior to today.
 MR. McGRAIL: Prior to today, I reviewed this particular matter, reviewed the briefs, I reviewed what had transpired before. Yesterday contacted the Board and indicated to the Board — and if you want to check that out —
CHAIRPERSON JOHNSON: That does not —
 MR. McGRAIL: Let me continue, if I might, I also attempted to call Attorney Cone. She did get my message, called back, and when she called back, I didn't get the message, and I have been in court all morning, so — and the reason for the call to Attorney Cone was to let her know what my position was going to be here today.
Id., pp. 5-6.
Attorney Cone, representing the City, then addressed the panel with an expression of "total surprise" at the Union's position. Claiming that the City was prejudiced by the Union's presentation of a legal argument which she had had no good reason to anticipate, she objected to the Union's belated objection and stated that the City had brought along Ms. Washington in case the panel wished to hear her testimony. As for the Union's claim that a Secondino inference was required due to the City's failure to call Ms. Washington at the July 27 hearing, she reminded the panel that Ms. Washington had been out of state on that date and that that fact had been revealed to the panel in the course of the hearing. Furthermore, she argued, a Secondino inference should not be CT Page 4439 drawn in an arbitration proceeding. Id., pp. 7-8.
Thereafter, following a brief but testy interchange between opposing counsel, the panel took a two-minute recess to caucus on what it should do. Following the caucus, Chairperson Johnson ended the hearing with the following pronouncement:
 CHAIRPERSON JOHNSON: I know that, and I want to state clearly that in no way is this Panel acknowledging that we have not properly exercised whatever rights and privileges we have, but rather then delay this any longer, we're going to allow the record to rest as it is, parties, having made the statement I made earlier, if they're willing to accept it, then that's fine, so be it.
Immediately following the adjournment of the March 2, 1993 hearing, Chairperson Johnson was observed by Union counsel to engage opposing counsel in a friendly conversation, thanking her and her witness for being there, "and, overall, being very solicitous." Plaintiff's Brief (on Application to Vacate), p. 7. As for Union counsel, however, the Chairperson "did not communicate with [him] at all." Transcript of 9/9/94 Hearing on Application to Vacate, p. 7.
DISCUSSION
 I.
The Union's initial argument in support of the pending application is easily disposed of. That argument — that the arbitration panel failed to make a mutual, final and definite award upon the subject matter submitted because, by attempting to reopen the proceeding without a motion by either party, they exceeded or imperfectly exercised their powers — is without merit for the following reasons.
First, to the extent that the Union has argued that the arbitration was in fact reopened, that argument is simply unfounded. Indeed, as Union counsel himself testified before this Court, and the transcript his stenographer produced clearly demonstrates, no one testified at the March 2, 1993 hearing, no evidence was submitted, and no argument on the merits of the controversy was invited, offered or entertained. CT Page 4440
Instead, in the ten brief minutes between the opening of the hearing and its post-caucus conclusion, the panel's entire focus, as voiced by Chairperson Johnson, was on Union counsel's objection to the proposed reopening and the perceived unfairness and inappropriateness of the Union's presentation of that objection without giving prior notice to the panel and opposing counsel. In sum, though Union counsel's tactical approach to the reopening question was found to be irksome and unmannerly by Chairperson Johnson, it ultimately led her and her fellow panelists to abandon their plan to reopen the hearing, and thus to leave the record as it was for the purpose of deciding the case. Not surprisingly, nothing that occurred of the reopening hearing is even mentioned in the panel's September 15, 1993 Award.
Even, however, if the arbitrators had reopened the hearing, they would have been well within their rights to do just that. General Statutes § 31-97(a) provides, in relevant part, as follows:
 Whenever a grievance or dispute arises between an employer and his employees, the parties may submit the same directly to said board . . . The panel shall fully investigate and inquire into the matters in controversy and take testimony under oath in relation thereto and may administer oaths and issue subpoenas for the attendance of witnesses and for the production of books and papers.
(Emphasis added). Connecticut General Statute § 31-97(a) clearly gives the arbitrators broad authority to carry out their purpose, which is to resolve disputed grievances.
The Union cites to Reg. Conn. Agencies, §§ 31-91-42 and31-91-43 to support its argument that the arbitrators cannot reopen arbitration hearings. Reg. Conn. Agencies, § 31-91-42
provides as follows that hearings are closed either at the end of evidence or when briefs are received.
 (a) the panel members shall inquire of both parties whether they have any further evidence to offer or witnesses to be heard. Upon receiving negative replies, the chairman CT Page 4441 of the panel shall declare the hearings closed.
 (b) If briefs or other documents are to be filed, the hearings shall be declared closed as of the final date set by the panel members for the filing of said summary briefs or documents (sic) with the board.
Reg. Conn. Agencies, § 31-91-42. However, Reg. Conn. Agencies, § 31-91-43 provides that "prior to the rendering of an award, a party may move to reopen a hearing for good cause shown such as the emergence of new evidence, but a hearing shall be reopened contingent solely upon the discretion of the panel chairman."
The Union claims that Reg. Conn. Agencies § 31-91-43 only allows the arbitration hearing to be reopened if one of the parties moves to reopen the hearing. On that basis it argues that the panel chair exceeded her authority when she attempted to reopen the hearing for further testimony. This argument is not supported by the laws of this State.
First, as stated above, the arbitrators are given authority to "fully investigate and inquire into the matters in controversy." Conn. Gen. Stat. § 31-97(a). The parties are also required to produce "such additional evidence as the panel members may deem necessary." Reg. Conn. Agencies, § 31-91-37(a). There is also no language in any of the SBMA's statutes or regulations, however, which prohibits the arbitrators from reopening the hearing to take further evidence, if they determine that such evidence is necessary. The Union thus wants the Court to read a prohibition into the regulation which does not exist.
The Union's argument is that because the regulations state that a party may move to reopen a hearing, the hearing can only be reopened by the parties. Had the regulation meant that only on a motion from the parties could the hearing be reopened, then it could have said so explicitly. Moreover, the regulation provides that the hearing can be reopened solely at the discretion of the panel chairman. The panel chair is given the discretion to reopen the hearing, and that discretion includes the discretion to reopen the hearing without the request of either party. CT Page 4442
Connecticut courts have also recognized the broad discretion arbitrators have in receiving evidence. In VincentBuilders, Inc. v. American Application Systems, Inc.,16 Conn. App. 486, 493 (1988), the Appellate Court held that arbitrators have broad discretion to admit evidence after the close of the hearing. "Arbitrators act with substantial discretion in determining that admissibility of evidence, and it is within their broad discretion to decide whether additional evidence is required or would merely prolong the proceedings unnecessarily." Id. Although the arbitrator in the Vincent Builders case did not allow a party to submit evidence after the close of hearing, the principle that arbitrators have broad discretion in allowing additional evidence after the close of hearing applies to this case. The court's finding that an arbitrator has broad discretion to receive evidence after the close of a hearing is also the equivalent of finding that he has the authority to open the hearing to take the additional evidence. Since arbitrators have broad discretion, and Conn. Gen. Stat. § 31-97(a) obligates arbitrators to fully investigate grievance arbitration, the panel chair in this case had the authority to request additional evidence after the close of evidence, if she determined such evidence was necessary to resolve the case.
Connecticut courts also grant great deference to an agency's interpretation of a statute or regulation it is charged with enforcing. "Ordinarily this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statutes's purpose." Department of Administrative Services v.Employees' Review Board, 226 Conn. 670, 678, 628 A.2d 957
(1993). This is especially true in the are of labor law. "In accordance with widely held principles of administrative and labor law, we traditionally have accorded deference to the labor board's interpretation of the acts it is charged with enforcing." Board of Education v. State Board of LaborRelations, 217 Conn. 110, 119-120 (1991). Although the Board of Education case dealt with the Board of Labor Relations, the principle still applies to the State Board of Mediation and Arbitration which also deals with a specific area of labor law.
Connecticut courts also defer to an agency's CT Page 4443 interpretation of its own regulations. "We accord great deference to the construction of a provision given by the administrative agency charged with the provisions enforcement . . . This principle applies with even greater force to an agency's interpretation of its own duly adopted regulations.Preston v. Department of Environmental Protection, 218 Conn. 821,830 (1991) (Citations omitted). The SBMA determined that it had the authority under Conn. Gen. Stat. § 31-97(a) and Reg. Conn. Agencies, § 31-91-43 to reopen the hearing when it sent out notice that a second hearing had been scheduled. The SBMA's interpretation that it had the authority to reopen the hearing is therefore entitled to great deference.
The rules of statutory construction in Connecticut also support the proposition that the panel chair has the authority to reopen the hearing on its own motion. The general rule for interpreting agency regulations is that the court may presume regulations to be "an accurate reflection of the legislative intent articulated in the statute's more general language."AFSCME v. New Britain, 206 Conn. 465, 470 (1988). Valid regulations have the force of statutes and constitute state law. Savage v. Aronson, 214 Conn. 256, 267 (1990). Since regulations constitute state law, the rules of statutory constructions used to interpret general statutes should also be used to interpret a regulation.
The principles of statutory construction provide that Connecticut courts must "construe a statute in a manner that will not thwart its intended purpose or lead -to absurd results." Turner v. Turner, 319 Conn. 703, 713 (1991). "If there are two possible interpretations of a statute, we will adopt the more reasonable construction over one that is unreasonable." Id. at 713. The obvious purpose of the arbitration statutes and regulations is for the arbitrators to determine that they need further evidence at the close of evidence, then the statutes and regulations support the proposition that they can reopen the hearing. Any other reading of the regulation would thwart the intended purpose of the SBMA's statutes and regulations and be unreasonable.
 II.
The Union's second contention on this application is that Chairperson Johnson so conducted herself, both during and immediately following the March 2, 1993 hearing, as to exhibit CT Page 4444 "evident partiality" towards the City and against the Union. For the following reasons, the Court disagrees.
An arbitrator acts with "evident partiality" whenever she so behaves or conducts herself that
 a reasonable person would have to conclude that [she] was partial to one party to the arbitration. To put is in the vernacular, "evident partiality" exists where it reasonably looks as though a given arbitrator would tend to favor one of the parties.
Local 530, AFSCME, Council 15 v. New Haven, 9 Conn. App. 260,274 (1986). So stating, the Appellate Court was careful to distinguish its test for "evident partiality" from two other tests that had been urged upon it.
The lesser, appearance-of-bias test, by which the behavior of judges is routinely measured, was felt to be inappropriate for arbitration proceedings for several reasons. Quoting from the Connecticut Supreme Court's decision inPetrowski v. Norwich Free Academy, 199 Conn. 231, 238 (1986) the Local 530 Court noted that
 "The canons of judicial ethics go far torward [toward] cloistering those who become judges, the ultimate arbiters of constitutional and statutory rights, from all extraneous influences that could even remotely be deemed to affect their decisions. Such a rarefied atmosphere of impartiality cannot practically be achieved where the persons acting as administrative adjudicators, whose decisions are normally subject to judicial review, often have employment or associations in the community they serve. It would be difficult to find competent people willing to serve, commonly without recompense, upon the numerous boards and commissions in this state if any connection with such agencies, however, remotely related to the matters they are called upon to decide, were deemed to disqualify them. Neither the federal courts nor this court require a standard so difficult to implement as a prerequisite of due process of law for administrative adjudication." CT Page 4445
Then, acknowledging that Petrowski involved administrative decision makers rather than arbitrators, the Appellate Court cited and discussed with approval several Second Circuit decisions explicitly declaring that in the context of an arbitration, "evident partiality" required more than the mere appearance of bias, which would disqualify a judge. SeeInternational Produce, Inc. v. A/S Resshavet [Rosshavet], 638 F.2d 548 (2d Cir.), cert. denied 451 U.S. 1017, 101 S.Ct. 3006,69 L.Ed.2d 389 (1981); Morelife Construction Corporation v. New York CityDistrict Council Carpenters Benefit Funds, 748 F.2d 79 (2d. Cir. 1984). of particular note, in this regard, is the following passage from the Local 530 Court's opinion, quoted with approval from International Produce v. A/S Rosshavet,supra, 551.
 "We agree . . . with the appellant, that the [U.S.] Supreme Court in Commonwealth Coatings Corporation v. [Continental Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968)] did not expand the [federal statutory] standard of `evident partiality' to include `appearance of bias.' In Commonwealth Coatings there was clear, unexplained evidence of `evident partiality.' Here we have an assertion of `appearance of bias' which seems to us, at best, to be speculation without substance . . . There was no claim of bias on the part of [the arbitrator], or even of any animosity toward any counsel. Thus, the record is completely bare of anything remotely resembling `evident partiality.'"
International Produce, Inc. v. A/S Rosshavet, supra, 551, quoted in Local 530, AFSCME, Council 15 v. New Haven, supra, 272-73.
The Court also rejected, explicitly though without a detailed statement of supporting reasons, the higher, virtually unsatisfiable, "proof of partiality" test. Local530, supra, 274. The most obvious reason for its rejection would appear to be that such a standard is unnecessarily high. Simply stated, when an arbitrator so conducts herself as to demonstrate "evident partiality," any hope for fairness in the adjudicative process, either in reality or in the eye of any CT Page 4446 reasonable participant therein, is so thoroughly dashed as to make any further inquiry on the subject pointless.
Here, then, the question presented for decision is whether Chairperson Johnson showed "evident partiality" for the City or against the Union in her reaction to the Union counsel's tactics of the aborted March 2, 1993 hearing. The Court is convinced that she did not.
To begin with, the entire basis for the Union's claim of "evident partiality" against Chairperson Johnson is her conduct at and very shortly after the aborted reopening hearing of March 2, 1993. She is not claimed to have had any general bias toward the City or against the Union as a result of her personal or business dealings, her community activities, her prior work as an arbitrator, or the like. To the contrary, she came into this arbitration as a true "neutral", in the sense that she neither had nor was claimed to have had any substantive pro-City or anti-union bias, and never showed any such bias at any stage of the arbitration proceeding.
Instead, Ms. Johnson has been taken to task for her expressions of displeasure with the tactics used by Union counsel to present his objection to the reopening of the arbitration. Plainly, Ms. Johnson was irritated because neither the panel nor opposing counsel had been given advance notice of the Union's intention to object to the proposed reopening. The hearing had been noticed for over five weeks, and its purpose was obviously not a secret. Hence, though the notice, as originally transmitted, did not state that the purpose of the "second arbitration hearing" was to receive testimony from Patricia Washington, that information was immediately available to Union counsel as soon as he asked for it.
Upon hearing of the proposed reopening, counsel could readily have notified the panel of his objections. Most logically and appropriately, he could have done so by submitting a written objection to the panel, with due service upon opposing counsel. Instead, however, he prepared for the hearing in silence, never notifying anyone even of his intention to object, much less of the grounds of his planned objection. CT Page 4447
Had the panel been apprised in advance of the Union's position, it could have requested and received briefs from both counsel, inspected the pertinent regulations and performed research on the questions raised, and otherwise prepared themselves appropriately to hear the objection and decide upon a proper cause of action. Had the information so developed persuaded them that reopening was not appropriate, they could have cancelled the hearing and spared everyone involved the time it needlessly took to conduct. If it left them in doubt as to how they should proceed, they could have convened a preliminary hearing to discuss only the Union's objection to the reopening, thus sparing Ms. Washington the necessity of attending. Or, of course, had the materials developed or submitted on the objection convinced them that the second hearing should proceed as planned, they could freely have conducted it with their eyed wide open as to the potential legal consequences of their decision.
Instead, they were faced on March 2, 1993 with a well prepared Union attorney, armed with a carefully crafted brief and a previously recruited stenographer, who had given no notice to anyone of his plan to object. Unprepared themselves to deal with a legal challenge which, if valid, was claimed to undermine the entire proceeding, and unaided in substances by counsel for the City, who herself was admittedly unprepared for substantive argument because she too had received no notice of the planned objection, the panel was understandably in a quandary as to what to do. Several months had already passed since the brief filing deadline, several weeks had already passed from the time the notice of the second hearing was sent out. Presented with an impossible choice between proceeding with the hearing at once, with the risk of undermining the validity of the entire proceeding, or further postponing the hearing to perform additional research on the propriety of reopening, the panelists understandably settled upon the third alternative which the Union desired and promoted by its tactics: leaving the record as it was without reopening the arbitration.
Against this background, Chairperson Johnson's expressions of frustration and displeasure, however, intemperate, were surely understandable. As a quasi-judicial officer responsible both for properly deciding the issues presented and administering a fair, efficient hearing, she was well within her rights to ask counsel why, by delaying the CT Page 4448 transmission of his objection, he had left the panel in such a difficult position. Had he simply filed his brief in advance, or otherwise given earlier notice of his objection, he could have accommodated the panel's interests in fair procedure and informed decision-making without sacrificing his own legitimate interest in preserving the record for later review. By failing to do so, he unnecessarily disrupted the hearing process and disaccommodated all persons involved therein in a manner that the Chairwoman was entitled to bring to his attention.
Having commented on counsel's failure to give the panel or opposing counsel notice of his objection, and established the length of time counsel had been aware of both the scheduling and the proposed subject matter of the new hearing, the Chairperson gave counsel an extended opportunity to state his objection for the record, clearly advising him both of the panel's desire for additional testimony and his own client's burden of proof on the pending grievance. Far from cutting him off in his presentation, she actually allowed herself to be interrupted by counsel, who ultimately completed his remarks with the unambiguous request that the arbitration not be reopened.
As final proof that the Chairperson was prepared to receive and rule fairly upon Union counsel's request, she and the other arbitrators granted that request after caucusing on it off the record.
A reasonable person reading the record of this arbitration would hardly believe that the Chairperson was likely to be partial to the City and against the Union because of her pointed colloquy with the Union's lawyer. Her comments neither betrayed nor suggested any expression of favoritism, prejudgment on the merits, or any other loss of impartiality. To the contrary, they gave clear evidence that she had an abiding commitment both to reaching a correct decision and to so doing by a procedurally fair and appropriate route. In fact, it was the adverse effect of Union counsel's tactics on her ability to do just that which obviously spawned her critical remarks. In short, the Union's charge that Chairperson Johnson acted with "evident partiality" is simply unfounded.[2]
 CONCLUSION
CT Page 4449
For the foregoing reasons, the Union's application to vacate is hereby denied.
Michael R. Sheldon, Judge